## Case No. 495.
### ANTRIM'S CASE.
[20 Leg. Int. 300;[1] 5 Phila. 278; 11 Pittsb. Leg. J. 49.]

District Court, E. D. Pennsylvania. Sept. 9, 1863.

WAR—MILITARY DUTY— EXEMPTION — FINAL DE-
CISION BY BOARD — CONCLUSIVENESS — ACT OF
MARCH 3, 1863

1. A statute which, in relation to summary proceedings before a military commission, en-

[1][Reprinted from 20 Leg. Int. 300, by permission.]

acts that its decision shall be final, does not necessarily make the decision conclusive as to the right which was in question.

2. The provisions of the 14th section of the act of congress of March 3, 1863, c. 75, [12 Stat. 733.] requiring the presentation, by drafted persons, of all claims of exemption to the board of enrolment, and making the board's decision final, do not, in the case of an exempt whose claim of exemption has been duly presented to the board and disallowed, preclude the subsequent consideration, under a writ of habeas corpus, of the question of his right of exemption.

3. Quere: Whether the question will be considered under such a writ at the instance of a party, who, having had proper notice and opportunity, has not presented his claim of exemption to the board, or has failed to comply with its reasonable regulations, of which he has had proper notice, or of a party who, after a rejection of such claim, and full subsequent time and opportunity to obtain an unobstructed judicial investigation of the question of alleged right, neglects to apply for the writ until after he has been mustered into military service.

On habeas corpus.

CADWALADER, District Judge. The provost marshal of the proper district returns to the habeas corpus that the petitioner was duly drafted and notified; appeared before the board of enrolment asking exemption as the only son of a widow dependent on his labor for support, [see 2 Stat. 731, § 2;] was duly heard upon his allegation and evidence, and that his claim of exemption was finally disallowed; that he subsequently appeared and reported himself for duty; received his uniform; asked and obtained leave of absence for a time not quite expired when the return was made; and, though not in the respondent's actual custody, was still under his control.

No question as to the effect of the occurrences posterior to the disallowance of the claim of exemption is properly raised by this return. These occurrences are not so stated in it that a traverse of them is necessary. Whether proof of them will ultimately be receivable against the petitioner, if proofs on his part of his alleged right shall have been admitted in the first instance, may be a question to arise hereafter. In the meantime, the question of the sufficiency of such a statement of these occurrences in a return is different. As acts of mere submission to military authority, where obedience would have been compellable, they can add nothing to the effect otherwise attributable to the decision of the board. His temporary acquiescence in it was no waiver of right. But, if the occurrences are mentioned for the purpose of showing that, notwithstanding his previous claim of exemption, he afterwards waived any right of exemption that he may have had, so as voluntarily to become a soldier under the draft, the voluntary waiver should have been directly averred. In a return, a statement of occurrences merely tending, more or less, to

prove such a fact, is not of equivalent effect. Sometimes, indeed, a fact consists of a series of connected, or mutually dependent, occurrences. They may then be stated in detail. But such a specification of the details of a fact is different from a mere specification of evidence, tending to prove it. The proposition or fact relied on, whether stated in detail or in that general form which is ordinarily more proper, should be set forth substantively so that the statement, if true, shall absolutely suffice in law. The occurrences mentioned in this latter part of the return, under the most favorable view of it, may or may not, independently of those previously stated, suffice to establish a waiver of right. This part of the return, therefore, does not require a traverse. The objections to it might not apply to returns properly framed in order to meet cases of drafted men who, after proper notice, have omitted to appear before the board and claim exemption, or of those appearing and claiming it, but omitting to comply with proper regulations of the board, of which sufficient information has been given. To cases of drafted men who, after the board's disallowance of their claims of exemption, have had fair time and opportunity to obtain elsewhere the judicial investigation of their alleged rights of exemption, and have not availed themselves of such opportunity, returns might perhaps be so adapted as to prevent unnecessary judicial interference with consummated military organizations embracing such parties.

The question upon the return is whether the military board's disallowance of the claim of exemption must be traversed; in other words, whether this board's decision that there was no right of exemption precludes inquiry here as to the existence of the right. This question depends upon the effect of the fourteenth section of the act of 3d March, 1863, c. 75, which enacts "that all persons drafted and claiming exemption from military duty on account of disability or any other cause, shall present their claims to be exempted to the board, whose decision shall be final." [Section 14, 12 Stat. 733.] Cognizance of the application for exemption, if taken, must be judicial, however special the jurisdiction or summary the proceeding. The point in question is whether the decision is or is not conclusive elsewhere as to the right of exemption. This depends on the effect of the word final. It certainly imports that the decision of the board shall not undergo executive or other revision. The decision is, relatively to military jurisdiction, conclusive as well as final. Therefore a decision of the board in favor of the claim of exemption, is necessarily conclusive as to the right of exemption. The question will be whether the effect of the words should be extended so as to make a decision against the claim equally conclusive against the right. The consideration of this question will involve the inquiry whether an enactment that the decision of such a tribunal shall be thus conclusive, would be constitutional.

The act of 3d March, 1863, has provided for the organization of an exclusively national military force by enrolment, draft, and, where necessary, impressment; that is to say, compulsion to serve. The words of this act, which might otherwise be of doubtful import, must be interpreted so that usurpation of power, beyond the legislative authority conferred by the constitution, may not be unnecessarily imputed to congress. The case has been commendably argued on this point, upon the words of the constitution and of the statute, without any such references to congressional debates, or to debates of those who drafted the constitution, or of those who proposed or discussed its early amendment, as, of late, have, perhaps, been too frequent. Such references to extrinsic matter, it is true, are not always improper. They are sometimes of legal assistance in explaining the meaning of words which are to be interpreted. This meaning may depend upon some relation of the words to occurrences of which historical memorials are preserved in the reports of cotemporaneous discussions. Where, moreover, the meaning of a word is doubtful, or has undergone change since the date of its use, the language of such discussions may sometimes serve, in some degree, the purpose of a glossary. Such cases are, however, not exceptions from, but, on the contrary, exemplify the rule that the intention is ascertainable from the words only. Under this rule, the proper inquiry is, not what may, from extrinsic sources, appear to have been intended by the men whose words are in question, but what was the legal meaning and application of the words when used. The rule applies where a single person has been the lawgiver, and with greater force of reason where a numerous assembly has made a law; and is applicable especially to the constitution of the United States and the amendments. This constitution was, when finished by its framers, as Ch. J. Marshall said, "a mere proposal without obligation or pretension to it." [M'Culloch v. State of Maryland,] 4 Wheat. [17 U. S.] 404. We read in the subsequent proposal by the first congress, of amendments that the conventions of a number of the states had, in adopting the constitution, expressed a desire for "declaratory and restrictive" additions, (1 Stat. 97); and Ch. J. Marshall has reminded us that almost every convention had recommended such amendments. [Barron v. Mayor, etc., of Baltimore,] 7 Pet. [32 U. S.] 250. The omission to specify which amendments were declaratory and which restrictive enabled persons who differed most widely in opinion as to the effect of the original constitution to concur in adopting ten of the series of

amendments proposed. Otherwise they would not have been adopted. The hope of reconciling the differences of opinion was in future judicial decision upon the constitution and amendments without any consideration of extrinsic matters. The powers conferred by the constitution upon congress to raise and support armies, and make rules for their government, are distinct from the powers which are conferred in it as to the militia of the respective states. Until the act in question, the national armies had been raised by voluntary enlistment. The system of enrolment and draft had long been matured as to the militia of the states. But, until the summer of 1862, the utmost penalty for not serving when drafted from such militia for the service of the United States had been pecuniary, with a limited imprisonment for non-payment. The act of congress of 17th July, 1862, [12 Stat. 597,] authorized impressment into the military service of the United States of those persons drafted from the militia under that act, who, when ordered to attend at the place of muster, disobeyed. The specific power of impressment had not been previously conferred. But, under the former system, though the fine for not serving had, when received, been considered an equivalent for service, the payment had nevertheless-been enforced, or the penalty of imprisonment inflicted by courts-martial, when the money was not otherwise collected. The constitutionality of this former jurisdiction of courts-martial may be considered established. Houston v. Moore, 5 Wheat. [18 U. S.] 1. It would not have been constitutional if disobedience to attend at a place of muster had not been a military offence. Congress, unless it had the power of absolutely subjecting a drafted person to military rule from the time of the draft, could not have thus made his disobedience before he was mustered into service a military offence. The act of congress of 1795, [1 Stat. 424, § 4,] which fixed the time of arrival at the place of rendezvous as the period of the commencement of the military service, might, constitutionally, in the opinion of the supreme court, have made the time of draft the period. [Houston v. Moore,] 5 Wheat. [18 U. S.] 17. The constitutionality of the act of 17th July, 1862, when the question was considered here in March last, in M'Call's Case, [Case No. 8,669,] appeared, therefore, to be established by authority. If the question had been thought an open one, the same view of the effect of the constitution would have been taken.

The act of 3d March, 1863, has adopted a like system, on an extended scale, for the purpose of raising national armies independently of the militia of the states. Under the former laws which have been mentioned, a question such as that now under consideration could not arise. The question under those laws could only have been that of a

military court's exercise of jurisdiction over a person who, having been lawfully drafted, already owed military service. There could not have been any dispute that the primary question whether he had been lawfully drafted or was liable to serve, was open to decision by the ordinary tribunals under a writ of habeas corpus. Here, however, the question is whether a military commission can so decide the original question of liability to serve, as absolutely to deprive all other tribunals of cognizance of it.

The enactments of the law in question are not so arranged that its provisions for the preparatory enrolment, and those for the draft, are always separated. They must, however, be kept distinct when they are considered with reference to the constitution. The most unlimited system of mere enrolment could not be constitutionally objectionable; but a system of drafting might be arbitrary and latitudinarian to such an extent as to encroach upon constitutional rights. That the framers of the constitution had inherited the parent nation's jealousy of the power to raise and support armies, appears from the prohibition to appropriate money to that use for a longer term than two years. The constitutional authority to enact the law which is under consideration was derived exclusively from this power to raise armies. It cannot be enlarged under the authority which the constitution also confers to make all laws necessary and proper for carrying the powers delegated, this one included, into execution. This incidental authority cannot extend beyond the limits of the principal power. A government previously republican, whose armies are, upon executive requisition, to be raised under a system of draft and impressment, administered without any restriction as to persons liable to serve, and without any limitation of the time of service, may, at the will of the chief executive magistrate, become an established military government. The constitution guaranties to every state a republican form of government. The supreme court have said that a military government, permanently established in a state, would not be republican, and that "it would be the duty of congress to overthrow it." [Luther v. Borden,] 7 How. [48 U. S.] 45. Congress, of course, could not establish such a government for the whole country.

The general provisions of the act are not unconstitutional. Those who are liable to do military duty under it are, in the first instance, described as all able-bodied male citizens, and persons of foreign birth who have duly declared their intentions to become citizens, between the ages of twenty and forty-five years, except persons rejected as physically or mentally unfit, and those exempted under seven other enumerated heads; the first including designated magistrates and other principal officers of the United States, and the others including re-

spectively the private persons, whose rights of exemption are specified. One of them is the only son liable to military duty of a widow dependent upon his labor for support. No persons not thus excepted are to be exempt; but no person convicted of any felony can be enrolled or permitted to serve. The preparatory enrolment is biennial, to be made in the present year, and hereafter in each alternate year, and to embrace those only whose ages will be, on the first of July in every year in which it is made, between twenty and forty-five years. They are to be enrolled in two separate classes, the first comprising all between the ages of twenty and thirty-five years, and all who are above the age of thirty-five and unmarried; the second class comprising all other persons liable to do military duty; and those in the second class are not, in any district, to be called into service until those of the first class shall have been called. All persons thus enrolled are subject for two years after the first of July succeeding the enrolment, to be called into military service, and to continue in it during the present rebellion, not, however, exceeding the term of three years. The president is authorized, whenever it may be necessary to call them out for such service, to assign to every enrolment district its quota of men to be furnished. In doing so, he is to take into consideration the number of volunteers and militia furnished by and from the respective states, and the period of their service since the commencement of the rebellion, and is to equalize the respective quotas by allowing for the numbers thus already furnished, and the time of their service. Upon such requisition of the president a draft is to be made, under his direction, of the required number, and fifty per cent. in addition. A roll of the names thus drawn, upon which they are to stand in the order in which drafted, is then to be made. The persons drafted are to be notified within ten days thereafter, and required to report at the rendezvous for duty. Provision is made for the acceptance of substitutes, and for the receipt of such commutation money as exempts those paying it, and enables the secretary of war to procure substitutes for them. Provision is also made for the hearing and decision of claims of exemption; and it is enacted "that as soon as the required number of able-bodied men liable to do military duty shall be obtained from the list of those drafted, the remainder shall be discharged."

This review of the principal enactments of the law suffices to indicate its general purposes. The organization of armies under it is to cease on the termination of the civil war for whose exigencies it provides; and the term of service of those drafted under it cannot exceed three years, though the war should continue longer. Such limitations of the time would have prevented the compulsory requirement of military service from being unconstitutional, though it had included every able-bodied male inhabitant. The administrative regulations of the law will next be considered.

The commission appointed for every enrolment district to execute the provisions of the act is designated in one section of it as the enrolling board, and in other sections as the board of enrolment. Biennial primary rolls, made by subordinate officers in the respective districts and sub-districts, having been reported to the board, are biennially consolidated into one list for each district. Of this list a copy is transmitted to the provost marshal general. The designation of the commission as the board of enrolment is referable not merely to these two stages of that preparatory enrolment, but also to the subsequent roll of the persons who have been drafted. This roll of drafted persons the board is required to make. The word enrolment, when used without any qualification, is, however, ordinarily understood as applicable only to the preparatory enrolment which must precede any draft.

The provisions of the 14th section, requiring the presentation of all claims of exemption to the board, and making its decision final, have been quoted. They do not apply to such a case of a person improperly drafted as depends neither upon a question of disability, nor upon one of exemption for any other specified cause. This opinion was acted upon in the Cases of Stingle and of Robinson. Stingle was drafted as enrolled in the first class. He alleged that he belonged to the second, which is composed of persons not exempt, but not as yet liable to be called into service. Robinson was a person liable to enrolment in the first class. But on the enrolment from which he was drafted, his name and occupation were entered incorrectly. The decisions of the respective boards of enrolment had been that these parties were liable to serve. Both cases were very fully argued, as the present case has also been. Stingle has been allowed to adduce proofs in support of his allegation that he was improperly enrolled in the first class. Robinson has been discharged from military restraint. The same decision was made in Tilghman's Case, where a resident of one sub-district, when sojourning in another, had been enrolled and drafted in the latter. These decisions do not affect the present question otherwise than as they may circumscribe it within ascertained limits.

Executive instructions and regulations have been greatly multiplied under authorities conferred by this act, and under assumed authorities which it has not conferred. These executive mandates, where authorized, have doubtless promoted various useful purposes, including that of securing a desirable uniformity throughout the United States, in

the course and modes of proceeding under the act. The sixth section requires "the provost marshal general, with the approval of the secretary of war, to make rules and regulations for the government of his subordinates," and perform other specified acts; among them, "to furnish proper blanks and instructions for enrolling and drafting." Under these two heads of enrolling and drafting, including their administrative incidents, executive instructions conformable to the purposes of the act, and to the provisions of the sixth section, are not less binding than if they had been contained in the act. But some of the executive instructions have, without any warrant in the act, assumed to regulate the exercise of the board of enrolment's duties as to applications for exemption under the fourteenth section. The exercise of this jurisdiction should be independent of regulation or other interference or supervision by any executive department of the government. Instructions of the latter kind, therefore, can have no imperative effect. This remark applies to the instructions which assume to regulate the practical course of proceeding of the board; and applies with greater force to those which assume to furnish rules for its decision upon questions of exemption. Some or all of these instructions which apply merely to the course of proceeding may, nevertheless, have been reasonably and properly adopted by the respective boards of enrolment as their own rule of their procedure; and, through such adoption may, after proper notice to parties appearing to claim exemption, have become regulations observable by such parties.

This independence of executive supervision or interference is neither less nor greater than that of an ordinary court-martial after its organization, and before its finding or sentence. Such independence does not prevent the board of enrolment, even when administering its jurisdiction, under the fourteenth section, from being a mere military commission. Its president is the provost marshal of the district, whose rank, pay and emoluments are those of a captain of cavalry, and who may, under the act, be an officer of this rank specially detailed. That such an officer may be thus detailed as a member, is conclusive as to the military character of the commission. The other members are the surgeon, who is also required by the act to inspect the drafted men at the rendezvous, and report on their physical condition; and a third person who, in another act of congress, passed on the same day (chapter 79, § 5) is called a "citizen at large." Under the latter act, the compensation of these two members of the board is that of an assistant surgeon of the army. Under a subsequent executive regulation, all the members of the board receive their dues through the pay department of the army. The powers conferred on the board

would have been exercisable with precisely the same legal effect as if congress had conferred them upon any officer of the army who might be from time to time specially detailed as a sole commissioner.

The requirement in the fourteenth section that all claims of exemption should be made before such local military commission is reasonable and convenient. Non-compliance with such a salutary provision, and with reasonable regulations made by such commissioners for carrying it into execution, might perhaps preclude such an inquiry as the petitioner now asks. But he has fulfilled the statutory condition; and the question recurs whether the additional enactment in the fourteenth section that the decision of the military commission shall be final has precluded inquiry here as to his right which was in question before the board.

To the board's independence of supervision, which resembles that of ordinary courts-martial, this enactment adds an independence of such executive revision as the proceedings of courts-martial and of other military commissions ordinarily undergo. Their findings and sentences do not ordinarily take effect, even provisionally, till after such revision. The exigency of a legal application for the word final is fulfilled when it is understood as meaning not subject to such executive revision. This makes it conclusive so far as military jurisdiction can properly extend. But even the word conclusive, if it had been superadded in the act, would, perhaps, not have made a decision against the claim conclusive against the right. [Clarke v. Patterson,] 6 Bin. 128. See [Mussina v. Hertzog,] 5 Bin. 387; [Wilson v. Young,] 9 Barr, [9 Pa. St.] 102. Upon the word final the question is more simple. There is no doubt that a decision may, relatively to the proceeding in which it was made, be final, and yet not conclusive elsewhere as to the right which was in question. See [Weston v. City Council of Charleston,] 2 Pet. [27 U. S.] 463; [Galbraith v. Black,] 4 Serg. & R. 211, 212. This remark is applicable especially to such summary proceedings under a special jurisdiction as are those of this board.

The meaning of the word "final" in this enactment must, of course, be thus qualified, if its effect would otherwise be unconstitutional. The argument that it would have been constitutional is that it would have been so if no exemption from military service had been specified in the act; that the exemptions specified were therefore not of right; that an army might constitutionally have been raised, not by draft or lot, but by selection; that a power of absolute selection might therefore have been directly conferred upon commissioners or a commissioner; and that the exemption in question, being consequently of mere grace, can be claimed only in the mode and under the conditions imposed. This argument, if an-

alyzed, will appear not to meet the constitutional difficulty.

The privilege of exemption is not the less of right because it has been legislatively conferred, or because it might have been altogether withheld. The mere form of the legislative enactment through which the immunity was obtained is, in this respect, immaterial. The right is conferred in the law by way of exception from a general enactment. This form of legislation, whatever opinion the lawgivers may possibly have entertained, cannot affect the substantive character of the right, and therefore cannot affect the question of constitutional power. As to privileges or immunities enjoyed through legislation, powers of government must be administered constitutionally, and their execution must be regulated in due subservience to judicial authority, exercisable through the proper organs. No power, otherwise unconstitutional, can, as qualifying rights, privileges or immunities, legislatively conferred or vested, acquire validity through any legislative annexation, express or implied, of a condition to their enjoyment. Such a condition as would abrogate, or abridge, the effect of a constitutional provision as to the judicial power cannot be implied from any phraseology of the act in question.

If armies may constitutionally be raised by selection, as distinguished from lot, the proposition is immaterial, because, under such a system, the power of selection would be executive, and not like that in question, which is judicial. If such a power should ever be conferred by congress, its definite character, the prescribed methods of its exercise, the official character of those exercising it, and the method of their appointment, might become subjects of judicial consideration. Congress cannot constitutionally delegate its own powers; but may confer executive and judicial powers upon those respectively who are, according to the constitution, qualified for their exercise. Those qualified, except a single class, must be such officers as are nominated to the senate, and appointed with its consent. Those of the excepted class are designated as inferior officers. Their capacities must necessarily be tested and limited in every case, with special relation to authorities which are, according to the distribution of the powers of government, superior. In the distribution of the judicial power, congress may establish inferior courts. But judges of such courts are not in the class of those inferior officers who can be appointed or designated without reference to the senate. Therefore, independent judicial powers could not be vested by congress in such a commission as the board of enrolment unless it is regarded as a tribunal simply military. Thus regarded, it can have no jurisdiction except over persons who are already under military rule. Whether a person is or is not under such rule is a question which a military tribunal may often have occasion to consider, and, so far as may concern its own proceedings, to decide. The tribunal may or may not be so organized that its decision of such a question is, relatively to military jurisdiction, final. But an act of congress making such a decision as to the status of a citizen final, in such a sense as to preclude altogether judicial cognizance elsewhere of the question, would not be constitutional. Such a law, if thus executed, would confer a judicial power not warranted by the constitution. Congress cannot give to such a mere military commission, or to a simple court-martial, any jurisdiction over a person who is neither in military service, nor locally amenable to the military police of a territorial space properly occupied for military purposes. Nor can congress confer upon such a special tribunal the power of conclusive adjudication, whether a case is within its own jurisdiction.

An argument in support of the return has been that, as to persons drafted under this act, the fourteenth section may, at a time like this, of rebellion, take effect constitutionally by suspending the privilege of the writ of habeas corpus. If this had been the intention of congress, it might have been simply, and would doubtless have been directly, expressed. An intention to frustrate a right by indirectly suspending a remedy, is not imputable to congress. Moreover, such legislation would not well comport with another act passed on the same day, authorizing, during the rebellion, the suspension of this privilege by the president, but requiring a sworn return of a detention in custody under his authority. The question of right is dependent more, perhaps, upon the amendments to the constitution than upon that provision of the original instrument which restricts the power to suspend this privilege. If the point were attended with any difficulty, the amendments might, in this respect, require full consideration. But I do not think it necessary. The return does not require a traverse.