# Kneedler *versus* Lane et al. Smith *versus* Lane et al. Nichols *versus* Lehman et al.

1. The act of Congress of March 3d, 1863, known as the *Conscription Act*, is unconstitutional. By LOWRIE, C. J., and WOODWARD and THOMPSON, J. J.

2. A Federal as well as a State officer, acting without constitutional authority, to the injury of any one, is liable to be sued for his acts in the State courts, and in such cases there is no distinction between preventive and redressive remedies. By LOWRIE, C. J.

[Kneedler *v.* Lane et al. Smith *v.* Lane et al. Nichols *v.* Lehman et al.]

3. The power of Congress "to raise and support armies" does not include the power to draft the militia of the States. By WOODWARD, J.

4. The power of Congress to call forth the militia cannot be exercised in the forms of the act of Congress of March 3, 1863, known as the "Conscription law." By WOODWARD, J.

5. A citizen of Pennsylvania cannot be subjected to the rules and articles of war until he is in actual military service. By WOODWARD, J.

6. A citizen of Pennsylvania is not placed in actual service, when his name has been drawn from a wheel, and notice thereof has been served upon him. By WOODWARD, J.

7. The power "to raise and support armies" is limited to voluntary enlistments, and necessarily so limited that the military of the States may remain in full force. By THOMPSON, J.

At NISI PRIUS. *In Equity.*

These three bills in equity were filed in the Supreme Court for the Eastern District by the plaintiffs above named, against the Officers of the Enrolling Boards of the First and Fourth Congressional Districts, praying for injunctions to restrain the defendants from further proceeding with or under the enrolment requisition and draft, under the act of March 3d, 1863, and particularly from all proceedings against the said plaintiffs. The ground alleged for these applications was the unconstitutionality of this act of Congress. A motion for a special injunction was made in each case at Nisi Prius before Mr. Justice Woodward (one on the 30th August, and two on the 1st September), who requested his brethren to sit with him at the hearing. The cases were argued before a full bench at Philadelphia, September 23, 1863, by Messrs. *George M. Wharton* and *Charles Ingersoll*, for plaintiffs—no counsel appearing on the part of defendants.

The opinion of the court was delivered November 9th, 1863, by

LOWRIE, C. J.—These are three bills in equity, wherein the plaintiffs claim relief against the defendants, who, acting under the act of Congress of the 3d March last, well known as the Conscription act, claim to coerce the plaintiffs to enter the army of the United States as drafted soldiers. The claim of the plaintiffs is founded on the objection that that act is unconstitutional. The question is raised by a motion for a preliminary injunction, and might have been heard by a single judge. But at the request of our brother Woodward, who allowed the motion, and on account of the great importance of the question, we all agreed to sit together at the argument. But we are very sorry that we are left to consider the subject without the aid of an argument on behalf of the government—its proper legal officers having deemed it their duty not to appear.

For want of this assistance I cannot feel such an entire conviction of the truth of my conclusions as I would otherwise have, for I cannot be sure that I have not overlooked some

grounds of argument that are of decisive importance.   But the decision now to be made is only preliminary to the final hearing, and it is to be hoped the views of the law officers of the government will not then be withheld.

, We have, however, a much greater difficulty in the decision of this question, and one that is quite inevitable.  It is founded on the fact that the question has become a question of politics, and the great parties of the country have divided upon it. People have not awaited the decision of the courts on the subject, and could not be expected to do so ; but have studied and decided it for themselves, or have rallied, in opposing ranks, in support of leaders who profess to have studied it or have done so.   Our own history shows that our courts have no *moral* authority adequate to bring such divisions into unity. That sort of authority requires a much larger degree of mutual confidence between the courts and the people than is usual in our experience, especially in times of popular excitement.

All men believe themselves impartial in the decision even of party questions, and therefore it is impossible for them to abandon their decisions on the mere authority of any one, unless when they feel that authority to be final.   Partiality in such matters seldom proceeds from any dishonest purpose, and generally arises from giving undue prominence to some purpose or idea that, in itself, is quite proper, and, of course, this is usually done quite unconsciously.   In times of excitement it is quite impossible to avoid this, and hence in such times moderate views are very sure to be condemned, and even government itself, in all its departments, is sure to be driven into measures which, in the course of a few years, are condemned and pass away.   With a sort of moral polarity, the extremes of social excitement breed each other, and moderation falls, for a while, powerless between them, and usually it is only by severe social trials that this condition of society is remedied, and then it is discovered what were the purposes and ideas to which undue prominence had been given, to the disturbance of the order and harmony of the State.

On this question we ought to be able to avoid this vice, which is so common in all moral and political reasoning; for our appeal is to the Constitution, a written standard, adopted by us all, sworn to by many of us, and obligatory on all who exercise the rights of citizenship under it, until they can secure its alteration in a regular and peaceable way.   By that standard alone can we try this act. Is it authorized by the Federal Constitution ?

That Constitution, adopting our historical experience, recognizes two sorts of military land forces—the militia and the

[Kneedler *v.* Lane et al. Smith *v.* Lane et al. Nichols *v.* Lehman et al.]

army,·sometimes called the regular, and sometimes the standing army—and delegates to Congress power "to raise and support armies," and "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions." But though this act of Congress is intended to provide means for suppressing the rebellion, yet it is apparent that it is not founded on the power of "calling forth the militia," for those who are drafted under it have not been armed, organized and disciplined under the militia law, and are not called forth as militia under State officers as the Constitution requires. Art. 1, 8, 16.

It is, therefore, only upon the power to raise armies that this act can be founded, and as this power is undisputed, the question is made to turn on the ancillary power to pass "all laws which shall be necessary and proper" for that purpose.—Art. 1, 8, 18. It is therefore a question of the *mode* of exercising the power of raising armies. Is it admissible to call forced recruiting a "necessary and proper" mode of exercising this power?

The fact of rebellion would not seem to make it so, because the inadequacy or insufficiency of the permanent and active forces of the government for such a case is expressly provided for by the power to call forth the usually dormant force, the militia; and that therefore is the only remedy allowed, at least until it has been fully tried and failed, according to the maxims, *expressio unis est exclusio alterius*, and *expressum facit cessare tacitum*. No other mode can be necessary and proper so long as a provided mode remains untried; and the force of these maxims is increased by the express provision of the Constitution, that powers not granted are reserved, and none shall be implied from the enumeration of those which are reserved.—Amendments 9, 10. A granted remedy for a given case would therefore seem to exclude all ungranted ones. Or, to say the least, the militia not having been called forth, it does not and cannot appear that another mode is necessary for suppressing the rebellion.

And it seems very obvious that a departure from the constitutional mode cannot be considered necessary because of any defect in the organization of the militia, for Congress has always had authority to correct this, and it cannot possibly found new powers in its own neglect of duty. Most of the Presidents have repeatedly called the attention of Congress to this subject, and yet it has never been adequately attended to. I do not know why it might not have been performed since this rebellion commenced, and yet I do not know that it could.

Though, therefore, this act was passed to provide means for suppressing the rebellion, yet the authority to pass it does not

[Kneedler *v.* Lane et al.　Smith *v.* Lane et al.　Nichols *v.* Lehman et al.]

depend on the fact of rebellion. That fact authorizes forced levies of the militia under their own State officers, but not for the regular army.

But it is not important that Congress may have assigned an insufficient reason for the law. If it may pass such a law for *any* reason, we must sustain it for that reason. The question then is—may Congress, independent of the fact of rebellion or invasion, make forced levies in order to recruit the regular army ?

If it may, it may do so even when no war exists or threatens, and make this the regular mode of recruiting; it may disregard all considerations of age, occupation, profession and offical station; it may take our governors, legislators, heads of State departments, judges, sheriffs and all inferior officers, and all our clergy and public teachers, and leave the State entirely disorganized; it may admit no binding rule of equality or proportion for the protection of individuals, States, and sections. In all other matters of allowed forced contribution to the Union, duties, imposts, excises, and direct taxes, and organizing and training the militia, the rule of uniformity, equality or proportion is fixed in the Constitution. It could not be so in calling out the militia, because the emergency of rebellion or invasion does not always allow of this.

But for the recruiting of the army no such reason exists, and yet, contrary to the rule of other cases, if it may be recruited by force, we find no regulation or limitation of the exercise of the power, so as to prevent it from being arbitrary and partial, and hence we infer that such a mode of raising armies was not thought of and was not granted. If any such mode had been in the intention of the fathers of the Constitution, they would certainly have subjected it to some rule of equality or proportion, and to some restriction in favor of State rights, as they have done in other cases of compulsory contributions to Federal necessities. We are forbidden by the Constitution from inferring the grant of this power from its not being enumerated as reserved; and the rule that what is not granted is reserved operates in the same way, and is equivalent to the largest bill of rights.

No doubt it would be unreasonable to suppose that Congress *would* so disregard natural rights as to take such an advantage of this want of regulation of their power, as that above indicated; but the fathers of the Constitution did presume that some such things are *possible*, and therefore they would have regulated the mode, if such a mode had been intended. It needed no regulation, if all recruits were to be obtained in the ordinary way, by voluntary enlistments.

Our jealousy of the usurpation of dominant parties is quite

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

natural, and has been inherited through many generations of experience of cavalier and roundhead, court and country, whig and tory parties, each using unconstitutional means of enforcing the measures which they deemed essential or important for the public welfare, or of securing their own power; and the fathers of the Constitution had experienced such usurpations from the very beginning of the reign of George III., and were not at all inclined to grant powers which, for want of regulation, might possibly become merely arbitrary. They had had no experience of forced levies for the regular army, except by the States themselves, and it seems to me they did not intend to grant such a power to the Federal government.

Besides this, the Constitution does authorize forced levies of the militia force of the States in its organized form, in cases of rebellion and invasion, and, on the principle that a remedy expressly provided for a given case, excludes all implied ones, it is fair to infer that it does not authorize forced levies in any other *case* or *mode*. The mode of increasing the military force for the suppression of rebellion being given in the Constitution, every other mode would seem to be excluded.

But even if it be admitted that the regular army may be recruited by forced levies, it does not seem to me that the constitutionality of this act is decided. The question would then take the narrower form. Is this mode of coercion constitutional?

It seems to me that it is so essentially incompatible with the provisions of the Constitution relative to the militia, that it cannot be. On this subject, as on all others, all powers not delegated are reserved. This power is not expressly delegated, and cannot be impliedly so, if incompatible with any reserved or granted power. This is not only the express rule of the Constitution, but it is necessarily so; for we can know the extent to which State functions were abated by the Federal Constitution only by the express or necessarily implied terms of the law or compact in which the abatement is provided for. And this is the rule in regard to the common law; it is changed by statute only so far as the expression of the statute requires it to be.

Now, the militia was a State institution before the adoption of the Federal Constitution, and it must continue so, except so far as that Constitution changes it, that is, by subjecting it, under State officers, to organization and training according to one uniform Federal law, and to be called forth to suppress insurrection and repel invasion, when the aid of the Federal government is needed, and it needs this force. For this purpose it is a Federal force; for all others it is a State force, and it is called in the Constitution " the militia of the several States," 2,

2, 1. It is, therefore, the standing force of the States, as well as, in certain specified respects, the standing force of the Union. And the right of the States to have it is not only not granted away, but is expressly reserved, and its whole history shows its purpose to be to secure domestic tranquillity, suppress insurrections and repel invasions. Neither the States nor the Union have any other militia than this.

Now, it seems to me plain that the Federal government has no express and can have no implied power to institute any national force that is inconsistent with this. This force shall continue, says the Constitution, and the Federal government shall make laws to organize and train it as it thinks best, and shall have the use of it when needed; this seems reasonable and sufficient; is the force provided for by this act inconsistent with it?

It seems to me it is. By it all men between the ages of 20 and 45 are "declared to constitute the national forces," and made liable to military duty, and this is so nearly the class which is usually understood to constitute the militia force of the States, that we may say that this act covers the whole ground of the militia and exhausts it entirely. It is, in fact, in all its features, a militia, for national instead of State purposes, though claiming justification only under the power to raise armies, and accidentally under the fact of the rebellion. In England this can be done, because, the State being a unit there, there can be no place for the distinction between State and Federal powers, and the army and militia forces become naturally confounded.

It seems to me this is an unauthorized substitute for the militia of the States. If valid, it completely annuls, for the time being, the remedy for insurrection provided by the Constitution, and substitutes a new and unprovided one. Or, rather, it takes that very State force, strips it of its officers, despoils it of its organization, and reconstructs its elements under a different authority, though under somewhat similar forms. If this act is law, it is supreme law, and the States can have no militia out of the class usually called to militia duty; for the whole class is appropriated as a national force under this law; and no State can make any law that is inconsistent with it. The State militia is wiped out if this act is valid, except so far as it may be *permitted* by the Federal government. If Congress may thus, under its power to raise armies, constitute all the State militia men into "national forces" as part of the regular army, and make them "liable to perform duty in the service of the United States when called out by the President," I cannot see that it may not require from them all a constant military training under Federal officers as a preparation for the

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

greatest efficiency when they shall be so called out, and then all the State militia and civil officers may be put into the ranks and subjected to the command of such officers as the President may appoint, and every one would then see that the constitutional State militia becomes a mere name.   The Constitution makes it, and the men in it, a national force in a given contingency, and in a prescribed form, but this act makes them so irrespective of the constitutional form and contingency.   *This is a substantial fact, and I am not able to refine it away.*

And it seems to me that this act is unconstitutional, because it plainly violates the State systems in this, that it incorporates into this new national force every State civil officer, except the governor, and this exception might have been omitted, and every officer of all our social institutions, clergymen, professors, teachers, superintendents of hospitals, &c., and degrades all our State generals, colonels, majors, &c., into common soldiers, and thus subjects all the social, civil, and military organization of the States to the Federal power to raise armies—potentially wipes them out altogether, and leaves the States as defenceless as an ancient city, with its walls broken down. Nothing is left that has any *constitutional right* to stand before the will of the Federal government.

If this be so, the party in power at any time holds all State rights in its hands.   It is subject to no restraints except that of the common morality of the time and of the party, and every one knows how weak and changeable this is in times of popular excitement, when the party in power, convinced of the rightness and greatness of its own ends, thinks lightly of the modes and forms that in any way obstruct or retard their attainment.   There are no constitutional restraints of this power, if it exists, and, therefore, if the unsteady morality of party excitements will bear it, the party in power may require all the troops to be drafted from the opposite party or from States and sections where it prevails.

Our fathers saw these dangers, and intended the Constitution to stand as a restraint upon party power.   They knew that a party in power naturally encroaches upon every institution that obstructs its will, and is inclined, when its power totters, to adopt extreme, unusual, and unconstitutional measures to maintain it; and they intended to guard against this.   They knew how Episcopalians, Independents, and Presbyterians, cavalier and round-head, court and country, whig and tory parties, had each in turn, when in power, tyrannized over their opponents, and sacrificed or endangered public liberty; they had felt how great was this evil in all the partisan struggles that preceded our revolution, and they desired posterity to profit by their experience.   The very restriction upon appro-

[Kneedler *v.* Lane et al.　Smith *v.* Lane et al.　Nichols *v.* Lehman et al.]

priations for the support of the army exceeding two years, is copied from our English ancestors, and was deemed by them a constitutional limitation of the party in power. None of our constitutions, State or federal, have any purpose or function more important than that of restraining and regulating the party that may chance to be in power, and that is one of the most important purposes of the separation of governmental functions into different departments.

Let any one recall a few of the instances in English history alone, without reference to our own or Roman or Grecian history, wherein liberty has been sacrificed to the interests of a party in power, and he will see how important are our constitutional restrictions, and how little probable it is that so great a power as this should have been left by our fathers without restriction —courts of high commission, ecclesiastical commission; and star chamber, and high courts of justice, and special commissions of oyer and terminer, under such judges as Scroggs and Jeffries, created for the purpose of trying and condeming acts which no law forbade—liberty of speech and of the press most cruelly punished by such courts when it ventured on too free a dissent from the policy of the dominant party—informations by the Attorney-General substituted in such cases for indictments by the grand jury—members of Parliament expelled because their opposition was offensive or dangerous to the ruling power—military officers dismissed because of their political opinions, as were Lord Shelbourne, General Conway, and Col. Barre, under the Granville ministry, for their opinions in favor of America—rumors of plots, real or fictitious, such as the Oates conspiracy, the Meal Tub and Rye House plots, raised and magnified in order to alarm the people against all opposition, and facilitate the downfall of dangerous rivals—patronage, pensions and seats in Parliament corruptly disposed of in opposition to public liberty—and the control of the militia so attempted to be usurped as to produce a revolution that resulted in the execution of Charles I. But it seems to me that all this experience was lost, in relation to a most important power, if the whole State militia system can be set aside by the Federal government at the very time when it ought to act with most vigor, as is done by this act. All this clearly shows how little reliance can be placed upon mere partisan morality in political affairs, and how necessary it is to have an acknowledged standard, such as the compact of the Constitution by which it is to be moderated and tried.

In England the popular jealousy of power was usually directed against the party which was ordinarily represented by the king, because he was a permanent authority; but in this country, in the act of framing the Federal Constitution, it could

[*Kneedler v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

be directed against no other power but that which the people were then creating, or the parties that were sure to contend for it, and history tells us that this jealousy was intense and watchful, and it was perfectly natural and inevitable that it should be so.   States, as well as individuals, are careful in putting themselves under the power of others.   That was the power to be feared in its relations with the States, and I know not how it is possible to suppose, that under the power to raise armies, they were really giving up their whole militia system, at the time when it is most needed, to be the instrument of a suspected power, a Federal party in power, always prone, whatever be its name, to place its respect for the time-honored doctrines of constitutional liberty in subordination to the intemperate, and therefore often disingenuous zeal for party success. In great political commotions, liberty is in its greatest peril; because, neither party knowing how to give or to receive those reasonable concessions or that generous respect that is necessary to restore peace, the occasion demands force, and alarm or excitement gives it an undue measure, which increases the resistance, and consequently the excitement or alarm and the force, until all the bulwarks of constitutional liberty are passed or swept away.

If Congress may institute the plan now under consideration as a necessary and proper mode of exercising its power " to raise and support armies," then it seems to me to follow with more force that it may take a similar mode in the exercise of other powers, and may compel people to lend it their money; take their houses for offices and courts; their ships and steamboats for the navy; their land for its fortresses; the mechanics and workshops for the different branches of business that are needed for army supplies; their physicians, ministers, and women for army surgeons, chaplains, nurses, and cooks; their horses and wagons for their cavalry and for army trains, and their provisions and crops for the support of the army.   If we give the latitudinarian interpretation, *as to mode*, which this act requires, I know not how to stop short of this.   I am sure there is no present danger of such an extreme interpretation, and that even partisan morality would forbid it; but if the *power* be admitted, we have no security against the relaxation of the *morality* that genders it.   I am quite unable now to suppose that so great a power could have been intended to be granted, and yet to be left so loosely guarded.

It may be thought that even voluntary enlistments in the regular army have the same sort of inconsistency with the militia system as forced recruiting has; but more careful reflection will show that it is not so.   Enlistment in the army takes away a part of the militia; but every militia system allows for

this, and the *general* purpose of both is the same—the constitution of a military force.   And, besides this, it is of the very nature of the system that it leaves every man free in the pursuit of his ordinary calling, and binds no man to any part of the militia, except by reason of his residence, which he may abandon or change as he pleases.

This act seems to me to be further unconstitutional in that it provides for a thorough confusion between the army and the militia, by allowing that the regular soldiers obtained by draft may be assigned by the President to any corps, regiment, or branch of service he pleases; whereas the Constitution keeps the two forces distinct.   Under this law, the President may even send them to the navy.   Under the militia system every man goes out with his neighbors and friends, and under officers with whom he is acquainted.   It is very properly suggested that, in 1790, General Knox, the Secretary of War under President Washington, and with his approval, and in 1814, Mr. Monroe, President Madison's Secretary of War, recommended plans of recruiting the army which were very similar to this one, and no doubt this is some argument in favor of its constitutionality. But, notwithstanding our great reverence for those illustrious names, it is impossible to admit them as very influential on this question, when we consider that neither of those plans was adopted by Congress, and the subject never received such a discussion as to settle the question.   Instead of Mr. Monroe's plan a pure militia bill was reported by Mr. Giles from the Senate's committee on military affairs.

I have noticed an argument that, because the notorious Hartford Convention opposed the war of 1812, and with it Mr. Monroe's plan of recruiting the army, therefore opposition to a similar plan now ought to be suspected as unpatriotic.   No doubt such an argument may have some influence, but it has no real value in ascertaining truth, for even bad men may have many correct principles.   It was not for opposition to Mr. Monroe's plan that that Convention became notorious.   Even their denunciation of it seems intended as a prefatory apology for their other schemes; for it was not prepared until two months after the plan had been virtually abandoned by the report of Mr. Giles' plan to the Senate.   The condemnation of the Hartford Convention was founded mainly on the undue and selfish prominence which it gave to, and the agitations it raised in favor of its own sectional interests, when the country was engaged in a dangerous war—its opposition to the admission of new States, for fear of losing the balance of power—its demand that negroes should be considered part of the militia—its opposition to persons of foreign birth being allowed to hold office, and to its real or supposed intention to produce a secession

of the eastern States, if it should not succeed in its measures. Their views, therefore, even by inversion, or *ad invidiam*, amount to nothing in favor of this law.

On the subject of our authority to hear such a case, I must infer, from the refusal of the Federal counsel to appear, that it is denied; and I express my views as well as I am able without that assistance which I think they ought to have rendered.

No one denies that a Federal as well as a State officer, acting without constitutional authority to the injury of any one, is liable to be sued for his acts in the State courts; and I am quite unable to discover that there is any distinction in such cases between preventive and redressive remedies. As at present advised, I cannot doubt that the State courts, having authority to determine the right in such cases in the first instance, they may exercise it according to any known remedy that suits the case, legal or equitable.

No ordinarily well-educated man can doubt that, independent of the Federal Constitution, such universal juridical power is inherent in the States, and might by them be assigned to their judiciary, as it is in our State in the authority to enjoin against all acts contrary to law and prejudicial to the rights of individuals; and, therefore, this power remains to the States, unless it is taken away by direct prohibition, or is otherwise incompatible with the Federal system.

No one that I know of pretends that it has been directly taken away. Indeed, so far as the Constitution itself goes, it is expressly left to the States, and therefore to the State courts; for the Constitution actually institutes no court but the Supreme Court; and it gives to it no original jurisdiction except in cases where a foreign minister or consul, or a State is a party. For all other cases within the Federal power it gives only appellate jurisdiction. And, as there may be no other than State courts to try those cases, the appellate jurisdiction of the Federal Supreme Court necessarily leaves an original jurisdiction in them.

True, the Constitution authorizes such inferior Federal courts as Congress may think proper to establish; but the authority to establish such inferior courts cannot divest this original State jurisdiction; for Congress might never exercise its authority, or it might not assign to them the whole of this original jurisdiction, or it might not assign it to them exclusively of the State courts. The very frame of the Constitution, therefore, admits that the States may have the original jurisdiction of such cases, subject to the appellate jurisdiction of the Federal Supreme Court, and no Federal law has yet forbidden it to them, even if this may be done.

And·such a judiciary system was not at all strange to the

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

fathers of the Constitution, and is well known in history.  It was the very system of the colonies before our independence.  Our colonial courts had authority to try all kinds of cases, whether arising under colonial or under imperial law, and the only remedy for misjudgment was by appeal or writ of error to the proper imperial courts in England; and so it was in Ireland before the union.  And so it is everywhere with courts and other authorities that are merely local in their constitution and jurisdiction; they administer even the general law of State, but always subject to the appellate authority of more general juris-diction.   And this appellate jurisdiction was in general con-sidered sufficient to preserve the Anglo-Saxon courts in due subordination to the royal courts after the Norman conquest; though *certiorari* to transfer causes before trial was also in use, and no Norman was bound to abide the judgment of a Saxon court to whose jurisdiction he chose to object.  No doubt a similar practice can be traced in every country, not purely despotic, where different state organizations or different peo-ples have been united under one general government.  In many cases the paramount law is *international* law, and yet national or State courts may decide what it is, subject to the appellate jurisdiction of treaties or of armies.

With all this present to the minds of the fathers of the Con-stitution, it seems to me that they could not have intended a departure without giving expression of their intention, and this they have not done.  They seem even to express the con-trary when they declare the Constitution and the laws made under it to be, not merely Federal law, but "the supreme law of the land," and require all State officers to be sworn to sup-port it.  That mere Federal *authority* does not exclude State *action* is very well illustrated by this very subject of the mili-tia, where the Federal authority to legislate has never been re-garded as preventing actual State legislation.  And the danger of conflicts between Federal and State authority is not different in its character from that which may arise between different departments of the same government, and lead to results that are quite insoluble.  Mutual trust and respect and a careful adherence to the Constitution can alone save us from such dif-ficulties.

It is with very real distress that I find my mind forced into this conflict with an act of Congress of such very great import-ance in the present juncture of Federal affairs; but I cannot help it.  Possibly, and the question is so presented that I can-not evade it, an argument from the counsel of the government might have saved me from this, if it is an error; and it may yet produce a different result on the final hearing, which I

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

trust will take place so soon that no public or private injury may arise from any misjudgment now and here.

Certainly in this great struggle we owe nothing to the rebels but war, until they submit, unless it be that we do not let the war so depart from its proper purpose as to force them to submit to a Constitution and system different from that against which they have rebelled. But we do owe it to each other, to minorities and individuals, that no part of that sacred compact of union shall become the sport of partisan struggles, or subjected to the anarchy of conflicting moralities, urged on by ambitious hopes veiled in the background. Our solemn oaths and plighted faith have made that compact the shield of State constitutions, institutions, and peculiarities, and of their right to their own free development, against all arbitrary and intermeddling action of the central government (which in all free countries represents a party), and I venture to hope that that shield will continue to afford its intended protection.

What I have written I have written under a very deep sense of the responsibility imposed upon me by my position, and with an earnest desire to be guided only by the Constitution. Very many will be dissatisfied with my conclusions; but I submit to the judgment of God, and also to that of my fellow citizens, when the present troubles shall have passed away and are felt no more.

I am in favor of granting the injunction in favor of each of the plaintiffs, for his own protection, but not for the staying of all proceedings under the act.

*Order.*—November 9, 1863. Preliminary injunction (in each case) granted for the protection of the plaintiff, on his giving bond with surety, to be approved by the prothonotary, in the sum of five hundred dollars, according to law, and refused for any further purpose.

Concurring opinion by

WOODWARD, J.—On the 3d day of March, 1863, the Congress of the United States passed an act for "enrolling and calling out of the national forces, and for other purposes," which is commonly called the Conscription Law. The plaintiffs, who are citizens of Pennsylvania, have set forth the act fully in their bills, and they complain that they have been drafted into military service of the government in pursuance of said enactment, but that the same is unconstitutional and void, and that the defendants, who are engaged in executing the act, have violated the rights and are about to invade the personal liberty of the plaintiffs, and thereupon they invoke the equitable interposition of this court to enjoin the defendants against a farther execution of the said act.

For the jurisdiction of this court to set aside an act of Con-

gress as unconstitutional, and to grant the relief prayed for, I refer myself to the views of the chief justice in the opinion he has just delivered in these cases, and I come at once to the constitutional question.

The act begins with a preamble which recites the existing insurrection and rebellion against the authority of the United States, the duty of the government to suppress insurrection and rebellion, to guarantee to each State a republican form of government, and to preserve the public tranquillity, and declares that for these high purposes a military force is indispensable, "to raise and support which all persons ought willingly to contribute," and that no service can be more praiseworthy and honorable than the maintenance of the Constitution and Union; and then goes on to provide for the enrolling of all the able-bodied male citizens of the United States, and persons of foreign birth, who have declared their intention to become citizens, between the ages of twenty and forty-five years, and these able-bodied citizens and foreigners, with certain exceptions afterward enumerated, are declared to be "*the national forces,*" and made liable to perform military duty when called out by the President. The act divides the country into military districts corresponding with the congressional districts, provides for provost marshals and enrolling boards, and regulates the details of such drafts as the President shall order to be made from the national forces so enrolled.   The payment of $300 excuses any drafted person, so that it is, in effect, a law providing for a compulsory draft or conscription of such citizens as are unwilling or unable to purchase exemption at the stipulated price.   It is the first instance in our history of legislation forcing a great public burthen on the poor.   Our State legislation, which exempts men who are not worth more than $300 from the duty of paying their own debts, is in striking contrast with this conscription law, which devolves upon such men the burthen which belongs to the whole "national forces," and to which "all persons ought willingly to contribute."   This, however, is an objection to the spirit of the enactment rather than to its constitutionality.

The description of persons to be enrolled, able-bodied citizens between twenty and forty-five years of age, is substantially the description of the militia as defined in our Pennsylvania statutes and probably in the statutes of all the States.   The national forces, then, mean the militia of the States—certainly include the militia of Pennsylvania.   This expression, "national forces," is modern language, when so applied.   It is not found in our constitutions, either State or Federal, and if used in commentaries on the Constitution, and in history, it will generally be found to apply to our land and naval forces in actual service—

[Kneedler *v*. Lane et al.   Smith *v*. Lane et al.   Nichols *v*. Lehman et al.]

to what may be called our standing army. It is a total misnomer when applied to the militia, for the militia is a State institution. The general government has no militia. The State militia, always highly esteemed as one of the bulwarks of our liberties, are recognized in the Federal Constitution, and it is not in the power of Congress to obliterate them, or to merge them in "national forces."

Unless there is more magic in a name than has ever been supposed, this conscript law was intended to act upon the State militia, and our question is, therefore, whether Congress has power to impress or draft the militia of the State. I cannot perceive what objection can be taken to this statement of the question, for surely it will not be argued that calling the militia national forces, makes them something else than the militia. If Congress did not mean to draft the militia under this law, where did they expect to find the national forces? "All able-bodied male white citizens, between the ages of twenty-one and forty-five years, residing in this State, and not exempted by the laws of the United States," with certain exceptions, constitute our State militia. Will it be said that the conscript law was not intended for these? I think it will not. Then if it does touch, and was framed and designed to draft this very class of citizens, no possible objection can be taken to the above statement of the question we have to decide.

I, therefore, repeat the question, with great confidence in its accuracy: has Congress the constitutional power to impress or draft into the military service of the United States, the militiamen of Pennsylvania?

This question has to be answered by the Constitution of the United States, because that instrument, framed by deputies of the people of the States, and ratified and put into effect by the States themselves in their respective corporate capacities, delegates to Congress all the powers that body can exercise. These delegations are either express or such implications as are essential to the execution of expressly delegated powers.

There are but three provisions in the Constitution of the United States that can be appealed to in support of this legislation. In our ordinary editions they stand numbered as clauses 13, 16 and 17 of the VIII. section of Art. 1 of the Constitution.

"13. Congress shall have power to raise and support armies, but no appropriations of money to that use shall be for a longer period than two years.

"16. Congress shall have power to provide for the calling forth the militia to execute the laws of the Union, to suppress insurrections and repel invasions.

"17. Congress shall have power to provide for organizing,

[Kneedler v. Lane et al.　Smith v. Lane et al.　Nichols v. Lehman et al.]

arming and disciplining the militia, and for governing·such part of them as may be employed in the service of the United States, reserving to the States respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress."

"To raise armies"—these are large words; what do they mean? There could be no limitation upon the number or size of the armies to be raised, for all possible contingencies could not be foreseen, but our question has not reference to numbers or size, but to the *mode* of raising armies. The framers of the Constitution, and the States which adopted it, derived their ideas of government principally from the example of Great Britain—certainly not from any of the more imperial and despotic governments of the earth. What they meant to make was a more free Constitution than that of Great Britain— taking that as a model in some things—but enlarging the basis of popular rights in all respects that would be consistent with order and stability. They knew that the British army had generally been recruited by voluntary enlistments, stimulated by wages and bounties, and that the few instances of impress· ment and forced conscription had met with the disfavor of the English nation and had led to preventive statutes. In 1704 and again in 1707 conscription bills were attempted in Parliament, but laid aside as unconstitutional. During the American revolution, a statute, 19 Geo. III. C. 10, permitted the impressment of "idle and disorderly persons not following any lawful trade, or having some substance sufficient for their subsistence," and this was as far as English legislation had gone when our Federal Constitution was planned. Assuredly the framers of our Constitution did not intend to subject the people of the States to a system of conscription which was applied in the mother country only to paupers and vagabonds. On the contrary, I infer that the power conferred on Congress was the power to raise armies by the ordinary English mode of voluntary enlistments.

The people were justly jealous of standing armies. Hence they took away most of the war power from the Executive, where, under monarchical forms, it generally resides, and vested it in the legislative department, in one branch of which the States have equal representation, and in the other branch of which the people of the States are directly represented according to their numbers. To these representatives of the States and the people, this power of orginating war was committed, but even in their hands it was restrained by the limitation of biennial appropriations for the support of the armies they might raise. Of course, no army could be raised or supported which did not command popular approbation, and it was rightly considered that voluntary enlistments would never be

[Kneedler *v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

wanting to recruit the ranks of such an army. The war power, existing only for the protection of the. people, and left, so far as it was possible to leave it, in their own hands, was incapable of being used without their consent, and, therefore, could never languish for enlistments. They would be ready enough to recruit the ranks of any army they deemed necessary to their safety. Thus the theory of the Constitution placed this great power, like all other governmental powers, directly upon the consent of the governed.

The theory itself was founded on free and fair elections—which are the fundamental postulate of the Constitution. If the patronage and power of the government shall ever be employed to control popular elections, the nominal representatives of the people may cease to be their real representatives, and then the armies which may be raised may not so command public confidence as to attract the necessary recruits, and then conscript laws and other extra constitutional expedients may become necessary to fill the ranks. But governmental interference with popular elections will be a subversion of the Constitution, and no constitutional argument can assume such a possibility.

Supposing, then, that the people are always to be fairly represented in the halls of Congress, I maintain that it is grievous injustice to them to legislate on the assumption that any war, honestly waged for constitutional objects, will not always have such sympathy and support from the people as will secure all necessary enlistments. Equally unjust to their intelligence is it to suppose that they meant to confer on their servants the power to impress them into a war which they could not approve.

When to these considerations we add the ability of a great country like ours to stimulate and reward enlistments both at home and abroad, by bounties, pensions, and homesteads as well as by political patronage in countless forms, we see how little necessity or warrant there is for implying a grant of the imperial power of conscription.

If the very improbable case be supposable, that enlistments into the Federal armies might become so numerous in a particular State as sensibly to impair its own proper military power, is it not much more improbable that the States meant to confer upon the general government the power to deprive them, at its own pleasure, altogether of the militia, by forced levies? Yet this might easily happen if the power of conscription be conceded to Congress. There are no limitations expressed—nothing to compel Congress to observe quotas and proportions as among the several States—nothing to prevent their raising armies wholly from one State, taking every able-bodied citizen out of it, to the endangering, if not utter undoing of all its domestic interests.

There is nothing in the history of the Constitution, nor in the debates upon it in the conventions, Federal and State, nor in those excellent contemporaneous papers known as the "Federalist," to justify the suspicion that this vast and dangerous power lies wrapped up in the few plain words of the thirteenth clause, but, on the contrary, the most indubitable evidence is derivable from all those sources that the thought of subjecting State militia to Federal draft had no existence in the minds of that day.   If such a construction had been anticipated, the objections which the Constitution encountered in the State conventions would doubtless have been found insurmountable. But what ought to be sufficient to settle the question is the language of clauses 16 and 17, which, if it have any meaning at all, absolutely forbids the interpretation on which the Conscription Act is founded.   And these clauses must be taken in connection with the 13th in fixing the meaning of the words "to raise and support armies," because the Constitution, like most other written documents, is its own best interpreter, and must be construed as a whole—by its four corners, as we sometimes say.   Therefore, if we concede this dangerous power to the language of the 13th clause, we destroy the force and effect of the words of the 16th and 17th clauses.   We make the instrument self-destructive, which is violative of all canons of construction.   Congress shall have power to provide for calling forth the militia in the manner, and subject to the limitations prescribed in clauses 16 and 17, and, therefore, I argue Congress has not the power to draft them.   Is an express rule of the Constitution to give way to an implied one?   If the 13th clause confers power to draft the militia, the words of the 16th and 17th clauses are the idlest that were ever written.  But if the 13th conferred only the power to enlist volunteers, then the subsequent clauses become very intelligible—stand well with the 13th, and add essentially to the martial faculties of the Federal government.   Look at those clauses.   The militia are to be called forth to execute the laws of the Union, suppress insurrections and repel invasions, to be organized, armed, and disciplined by the State, but according to the laws of Congress, and such part of them as may be employed in the service of the United States are to be governed by the President, but officered by the respective States.   Now, this conscription law recites an "existing insurrection and rebellion" as the ground and reason, not for calling forth the militia under the above provisions, but for *drafting* them.   The very case has occurred in which the Constitution says the militia shall be called out under State officers, but Congress says they shall be drafted, in contempt of State authority.   This cannot be put on that clause of the

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

Constitution which authorizes Congress to make all laws necessary and proper for carrying into execution the foregoing powers, because that is not a grant of any additional powers, but only of the legislative faculty to execute "the foregoing powers." What those powers are is first to be ascertained, and then, in virtue of this provision, Congress may provide the necessary and proper laws. The question we are dealing with has not reference to the mere forms of legislation, but to the essential powers of government. If *any* conscription law may be directed against State militia, for the suppression of rebellion and insurrection, this may be conceded to be a valid enactment, but whether a government of limited and expressly delegated powers may, for such a purpose, forcibly take away the militia of other governments, which are sovereign in their respective spheres, is a question which the instrument of delegation can alone answer. Congress have said in this act that the rights of States may be thus disregarded. Gen. Washington and the men of his day did not so read the Constitution, when, in suppressing the whiskey insurrection in this State, they paid the most scrupulous regard to the rights and powers of the State. Under pressure of a foreign war, a conscript bill was reported in Congress in 1814, but it did not pass, and if it had it would have been no precedent for this law, because we are now dealing with an *insurrection*, and insurrections are specially provided for in the Constitution. If to support a foreign war, Congress may draft the militia, which I do not admit, the power of draft to suppress insurrections is not to be implied, since another mode of suppressing insurrections is expressly provided. When a State is called on for its quota of militia it may determine, by lot, who of the whole number of its enrolled militia shall answer the call, and thus State drafts are quite regular; but a congressional draft to *suppress insurrection* is an innovation that has no warrant in the history or text of the Constitution. Either such a law, or the Constitution must be set aside. They cannot stand together.

And, happily, no ill consequences can flow from adhering to the Constitution, for the standing army of the Federal government, recruited by enlistments in the ordinary mode, with the State militia, called forth according to the Constitution, are a force quite sufficient to subdue any rebellion that is capable of being subdued by force of arms. Such a formidable force, wisely wielded, in connection with a paternal and patriotic administration of all other constitutional powers, will never fail to put down refractory malcontents, and preserve peace and good order among the American people. This conscript law, therefore, not sanctioned by the Constitution, is not adapted to

the exigencies of the times, nor likely to have success as a war measure.

In its political bearings, even more than in its military aspects, it is subversive of the Constitution and of the rights of citizens that depend upon State authority. A few thoughts will make this plain.

It is impossible to study our State and Federal Constitutions without seeing how manifestly the one was designed to guard and maintain the personal and social rights of the citizen—the other to take care of his external relations. Nurture, education, property, home, wife and children, servants, administration of goods and chattels after death, and a graveyard in which to sleep the sleep of death, these are among the objects of State solicitude, for the protection of which the State provides civil authorities, and back of them the *posse comitatus*, and the militia, to make the civil administration effectual. Now, if the principle be admitted that Congress may take away the State militia, who does not see that the ultimate and final security of every man's domestic and personal rights is endangered? To the extent delegated in the Constitution, nobody questions the right of Congress to control the State militia, but if to the extent to which this enactment goes, the States will be reduced to the condition of mere counties of a great commonwealth, and the citizen of the State must look to the Federal government for the enforcement of all his domestic rights as well as for the regulation of his external relations.

The citizens of the State need protection from foreign foes and Indian tribes—peaceful intercourse and commerce with all the world—a standard of values, and of weights and measures that shall be common to all the States, and a postal system that shall be co-extensive with interstate trade and commerce. To adjust and maintain these external relations of the citizen are high duties which the Constitution has committed to the Federal government, and has furnished it with all necessary civil functionaries, and with power to levy and collect taxes from the people of the States, to raise and support armies, to provide a navy, and to call forth the militia to execute the laws.

Thus is the American citizen amply provided, by means of constitutions that are written, with protection for all his rights natural and artificial, domestic and foreign, but, as the war power of the general government is his ultimate security for his external, so is the militia his ultimate security for his internal or domestic rights.

Could the State government strike at the war power of the Federal government without endangering every man's rights? In view of the existing rebellion, no man would hesitate how to answer this question, and yet is it not equally apparent that

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

when the Federal government usurps a power over the State militia which was never delegated, every man's domestic rights (and they are those which touch him most closely) are equally endangered?

The great vice of the conscript law is, that it is founded on an assumption that Congress may take away, not the State rights of the citizen, but the security and foundation of his State rights. And how long is civil liberty expected to last after the securities of civil liberty are destroyed? The Constitution of the United States committed the liberties of the citizen in part to the Federal government, but expressly reserved to the States, and the people of the States, all it did not delegate. It gave the general government a standing army, but left to the States their militia. Its purpose in all this balancing of powers was wise and good, but this legislation disregards these distinctions, and upturns the whole system of government, when it converts the State militia into "national forces," and claims to use and govern them as such.

Times of rebellion, above all others, are the times when we should stick to our fundamental law, lest we drift into anarchy on one hand, or into despotism on the other. The great sin of the present rebellion consists in violating the Constitution, whereby every man's civil rights are exposed to sacrifice. Unless the government be kept on the foundation of the Constitution, we imitate the sin of the rebels, and thereby encourage them, whilst we weaken and dishearten the friends of constitutional order and government. The plaintiffs in these bills have good right, I think, as citizens of Pennsylvania, to complain of the act in question, not only on the ground I have indicated, but on another to which I will briefly allude.

The twelfth section provides that the drafted person shall receive notice of the rendezvous at which he is to report for duty, and the thirteenth section enacts "that if he fails to report himself in pursuance of such notice without furnishing a substitute or paying the required sum therefor, he shall be deemed a deserter, and shall be arrested by the provost marshal, and sent to the nearest military post for trial by court marshal." The only qualification to which this provision is subject is, that upon proper showing that he is not able to do military duty, the board of enrolment may relieve him from the draft.

One of the complainants, Kneedler, has set forth the notice that was served on him in pursuance of this section, and by which he was informed that "unless he appeared on a certain day he would be deemed a deserter, and be subject to the penalty prescribed therefor by the rules and articles of war." I believe the penalty of desertion by the military code is any

corporeal punishment a court martial may choose to inflict, even to that of being put to death.

Can a citizen be made a deserter before he has become a soldier? Has Congress the constitutional power to authorize provost marshals, after drawing the name of a freeman from a wheel and serving him with a ten days' notice, to seize and drag him before a court martial for trial under military law? This question touches the foundations of personal liberty.

In June, 1215, the barons of England and their retainers, a "numerous host encamped upon the grassy plain of Runnymede," wrung from King John that great charter which declared, among other securities of the rights and liberties of Englishmen, that "no freeman shall be arrested, or imprisoned, or deprived of his freehold, or his liberties, or free customs, or be outlawed or exiled, or in any manner harmed, nor will we (the King) proceed against him, nor *send any one against him by force of arms* unless according to the sentence of his peers (which includes trial by jury) or the common law of England." Here was laid the strong foundation of the liberties of the race to which we belong. And yet not here, for Magna Charta *created* no rights, but only re-asserted those which existed long before at common law. It was for the most part, says Lord Coke, merely declaratory of the principal grounds of the fundamental laws of England. Far back of Magna Charta, in the customs and maxims of our Saxon ancestry, those principles of liberty lay scattered which were gathered together in that immortal document, which, four hundred years afterwards, were again re-asserted in two other great declaratory statutes, "The Petition of Right" and "The Bill of Rights," and which were transplanted into our Declaration of Independence, the bill of rights to our State Constitution, and the amendments to our Federal Constitution, and which have thus become the heritage of these plaintiffs. Says the fifth article of the amendments: "No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces or in the militia when in actual service in time of war or public danger." What is the scope of this exception? The land or naval forces mean the regular military organization of the government, the standing army and navy, into which citizens are introduced by military education from boyhood or by enlistments, and become, by their own consent, subject to the military code, and liable to be tried and punished without any of the forms or safeguards of the common law. In like manner the militia, when duly called out and placed "in actual service," are subject to the rules and articles of war, all their common law rights of personal freedom being for the time suspended.

But when are militia men in actual service? When they have been notified of a draft? Judge Story, in speaking of the authority of Congress over the militia, says: "The question when the authority of Congress over the militia becomes exclusive, must essentially depend upon the fact when they are to be deemed in the actual service of the United States. There is a clear distinction between calling forth the militia and their being in actual service. These are not contemporaneous acts nor necessarily identical in their constitutional bearings. The President is not commander-in-chief of the militia, except when in actual service; and not merely when they are ordered into service. *They are subjected to martial law only when in actual service, and not merely when called forth before they have obeyed the call.* The acts of 1795 and other acts on the subject manifestly contemplate and recognize this distinction. *To bring the militia within the meaning of being in actual service, there must be obedience to the call, and some acts of organization, mustering, rendezvous, or marching done in obedience to the call in the public service.*" Story's Con. Law, vol. 3, sec. 1208.

If it be suggested that this plain rule of common sense and constitutional law is not violated by the conscription act, because it applies to the "national forces," I reply, as before, that this is only a new name for the militia, and that the constitutional rights of a citizen are not to be sacrificed to an unconstitutional name. When Judge Story was endeavoring to mark with such distinctness the time at which the common law rights of the citizen ceased and his liability to military rule began—the time, in a word, when he became a soldier—why did it not occur to his fertile mind that Congress could render this distinction valueless and unmeaning by a new nomenclature—by calling the militia "national forces"? It is not difficult to conceive how such a suggestion would have fared had it occurred or been made to him. But it is difficult, in the presence of the grave issues of the present day, to treat so frivolous a suggestion with the dignity and forbearance the occasion demands. I have shown what rights of personal liberty these plaintiffs inherited from a remote ancestry, and how they are guaranteed to them by our constitutions, and at what time they are to give place to martial law, and surely if a wheel set in motion by Congress can crush and grind those rights out of existence, without regard to the limitations of the Constitution, some weightier reason should be found for it than the misnomer which the act so studiously applies to the militia—some reason that deserves to stand instead of Magna Charta, our Constitutions, and all our traditional freedom.

The only one that I have ever heard suggested, and which is applicable against all the views advanced in this opinion, is

called military necessity. The country is involved in a great civil war which can be brought to an honorable close only by an energetic use of all our resources, and no restraints should be tolerated, in such circumstances, save only those which Christian civilization has imposed on all warfare. Whatever is according to the Constitution, the argument claims, may be done, of course; whatever is over and beyond the Constitution is justified as military necessity, and of that the President and Congress are exclusive and final judges.

The amount of the argument is that the exigencies of the times justify the substitution of martial law for the Constitution. But what is martial law? Blackstone and Sir Mathew Hale tell us "it is built upon no settled principles, but is entirely arbitrary in its decisions, is, in truth and reality, no law, but something indulged rather than allowed as law." The unrestrained will of one or a number of men, then, is the rule which the argument substitutes for the Constitution. It is of no consequence that the will thus set up for supreme law is that of men whom a majority of the people have chosen, because, according to our system, the majority can only choose men to administer the Constitution as it is written. Majorities, as a power recognized by law, have no more right to establish a despotism than a minority would have. But may majorities or minorities set aside the Constitution under pressure of rebellion and insurrection?

As the Constitution anticipates and provides for such calamities, it is a reproach to its wisdom to say that it is inadequate to such emergencies. No man has any historical right to cast this reproach upon it. No current experience proves it. It never can be proved except by an unsuccessful use of the legitimate powers of the Constitution against rebellion, and then the thing proved will be that the instrument needs amendment, which its machinery is flexible enough to allow. Even such a melancholy demonstration would do no more than point out necessary amendments—it would not surrender the people to the arbitrary will of anybody. Presidents and congressmen are only servants of the people, to do their will, not as that will may be expressed under passion or excitement, but as it stands recorded in the Constitution. It is the Constitution, indeed, which makes them presidents and congressmen. They have no more power to set up *their* will against the Constitution than so many private citizens would have. Outside of the Constitution they are only private citizens.

I do not, therefore, feel the force of the argument drawn from the distressing circumstances of the times. Bad as they are, we make them worse by substituting arbitrary power for constitutional rule; but if we made them better and not worse,

[Kneedler *v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

the judicial mind ought not to be expected to approve the sub-
stitution, for it can recognize no violation of the Constitution
as a legitimate mode of vindicating the Constitution.   To place
ourselves under despotic sway, in order to bring back rebels to
the Constitution we have given up, is a procedure that perplexes
the student of political science, and will quite confound the
future historian of our times.

.There are other features of the conscript law that deserve
criticism, but, not to extend my opinion farther, I rest my ob-
jections to its constitutionality upon these grounds:—

1st. That the power of Congress to raise and support armies
does not include the power to draft the militia of the States.

2d. That the power of Congress to call forth the militia can-
not be exercised in the forms of this enactment.

3d. That a citizen of Pennsylvania cannot be subjected to
the rules and articles of war, until he is in actual military ser-
vice.

4th. That he is not placed in such actual service when his
name has been drawn from a wheel, and notice thereof has been
served upon him.

For these reasons I am for granting the injunction.

Concurring opinion by
THOMPSON, J.—The act of Congress under which the com-
plainant in this case is required to enter the army of the United
States as a soldier, for a period of three years or during the
war, provides for the enrolment, by officers of the United
States, of all persons liable to do military duty, between the
ages of 20 and 45 years, and classifies them.   The names of
all persons thus enrolled were required 'to be put into a wheel,
and the requisite number for the districts, with a surplus of 50
per cent. for contingencies, were to be drawn thence under the
supervision of certain Federal officers.   Those thus drawn from
the wheel, if not exempted from disability or otherwise, will
be compelled to serve for the period mentioned, or find.accept-
able substitutes, or commute the service by the payment of
$300.

Beyond all controversy this is a draft, or involuntary con-
scription from the militia of the States, without any requisition
upon State executives, or upon officers in command of the
militia in the States, and without any reference to State autho-
rities whatever.   Is this enactment in accordance with the
Federal Constitution?   The answer to this question determines
the case, for it is not denied that the complainant is within the
provisions of the act, and was drawn as and for a soldier under
its provisions.   He must, therefore, serve, if the act be consti-
tutional, or seek exemption under some of its provisions.

[Kneedler *v.* Lane et al.     Smith *v.* Lane et al.     Nichols *v.* Lehman et al.]

Our jurisdiction of the case, I think, is plain. We have authority to restrain acts contrary to law, and prejudicial to the rights of individuals, act of 16th June, 1836. If the act of Congress of 3d March, 1863, under and by virtue of which the complainant is holden as a soldier, and sought to be coerced into the service, be not constitutional, the custody of his person under pretence of it, is contrary to law, and prejudicial to his interests. The injury too, if the proceedings be illegal, is undoubtedly within what is denominated irreparable injury or mischief, and hence the propriety of the specific remedy. An action for damages would perhaps not be sustainable under a recent act of Congress, but if it should be, it would be against parties who intended no injury, and from whom, on account of obeying what they supposed to be law, in conducting the proceedings against him, but little could be recovered, although the soldier may have been carried to distant places, from his home, and may have undergone great hardships and vicissitudes. I dismiss this branch of the case, with this short view of it, and with the additional remark, that if our judgment is against the constitutionality of the law, the case can be removed to the Federal judiciary at Washington, if the authorities there see proper, and be reviewed by the court in the last resort in such cases; a thing which the President of the United States has, on a recent occasion, expressed a wish for, and determination to facilitate.

I now proceed to the main question. The Constitution of the United States defines and enumerates the powers of the general government, and limits them by the solemn declaration that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The government established by the Constitution is, therefore, a limited government, beyond the limitations of which, including necessary incidents of expressly granted powers, all exercise of authority by Congress is mere usurpation. We should remember this in construing the Constitution, and we should remember, also, that the entire machinery of government, provided by it, was poised between checks and balances designed not only to prevent it from transcending its own orbital limits, but to guard against aggressions from other sources. The objects to be attained, as declared in the preamble, must also be kept in view, when we are called to expound its provisions; and we are bound to construe it so as to preserve and advance them all. The purpose, as declared in the preamble, was "to form a more perfect union, establish justice, ensure domestic tranquillity, provide for the common defence, promote the general welfare and secure the blessings of liberty to ourselves

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

and our posterity." Each of these objects are supposed to be secured by the Constitution, and no one of them must be overlooked in a too eager desire to lend a supposed efficiency to some other. To do so would endanger the whole. To "provide for the common defence" is one purpose avowed for establishing the Constitution, and the duty devolves on Congress to execute it; but it must not be executed in such a manner as to encroach on the paramount purpose of securing "the blessings of liberty to ourselves and our posterity," also declared. This is one instance to show that no legislation, nor no construction can be valid or sound which is not in harmony with every provision of the Constitution.

In the light of these general and fundamental principles, we must investigate the grave questions presented by the bill of the complainant now before us. And here I may express my regret, that it did not meet the views of the government officials, having in charge the law department for this United States district, to appear at the argument of this case, of which they had notice, and give us the benefit of their views and researches on the momentous questions involved. It can hardly, I presume, be fairly attributable to a disregard of what might be the ultimate judicial action of the State on the question, or in contempt of State authority altogether. Whatever may have been the reason for the course adopted, the magnitude of the question involved is not at all diminished thereby, nor is our duty most carefully to examine the whole case in all its aspects, the less imperative.

Is the act of Congress, approved March 3d, 1863, entitled, " An act for enrolling and calling out the national forces, and for other purposes," now familiarly known as the Conscription Act, constitutional?

In order to provide for the common defence and thereby promote the general welfare, Congress has, by the Constitution, power to "raise and support armies," and "to provide and maintain a navy." It was under no extraordinary pressure of circumstances or emergent necessity that this power was granted. It was deemed to be, and thereupon introduced as, a part of the ordinary machinery of government, the convention acting on an axiom as old as government itself, "that the surest means of avoiding war is to prepare for it in times of peace." Without such a power, " it would," says Story in his Commentaries on the Constitution, section 1185, "present the extraordinary spectacle to the world of a nation incapacitated by a Constitution of its own choice from preparing for defence before actual invasion."

It was an ordinary power, not superinduced by impending war. "In the mild season of peace," says the Federalist No.

[Kneedler v. Lane et al.  Smith v. Lane et al.  Nichols v. Lehman et al.]

2, "with minds unoccupied by other subjects, they (the convention) passed many months in cool, uninterrupted, and daily consultation ; and finally, without having been awed by power, or influenced by any passion, except love for their country, they presented and recommended to the people the plan produced by their joint and unanimous councils." Is there room for a doubt that under such circumstances, the mode in which the power to "raise armies" was to be executed was the accustomed one ; namely, by voluntary enlistments ? At the time, this was the usual mode of raising. and recruiting armies in Great Britain, and the people of this country were better acquainted with the laws, customs, and even habits of the people of England than of those of any other people in the world. Notwithstanding we had been at war with them, and an angry spirit had been generated between the two countries, yet it is a notorious fact that their customs and laws were generally adopted in this country, and to this day continue to a great extent. Voluntary enlistments as by contract, was the general method of raising armies there and with us prior to and at the time the Constitution was framed. As this was the customary mode, every presumption supports the idea that this was the only mode in the minds of the framers of the Constitution. Indeed, it is a common law rule, that when anything is directed to be done without special instructions as to how the act is to be performed, the customary mode of doing it is supposed to be included in the direction. We cannot suppose that at the moment the country had achieved its liberty, at so much cost of blood and treasure, that such a despotism over the lives and liberties of men would be incorporated into the Constitution as would authorize Congress to fill the armies to be raised by conscription, as though by the agency of the press gang. This was no more in the contemplation of the convention than that the civil department of the government should also be filled by coercive measures. Can any one now be credulous enough to believe that if a power had been supposed to exist to raise an army not by voluntary means but by coercive, especially as there were no limits fixed as to its magnitude, that the Constitution would have been ratified by the States? The idea would, it seems to me, be preposterous. Without such a thought once having been suggested by the opponents of the Constitution, a standing army, to be raised in the usual way, was a source of many fears in the public mind. It was thought to be dangerous to' liberty in its very nature, but what would have been thought, if it had been discovered or avowed that in its creation-it might be directly and openly destructive of the individual liberties of those who were to compose it, and that it might be extended to embrace all the able bodied citizens in

the States! It required many numbers of the ablest paper ever written on the Constitution, I mean the Federalist, to remove those fears.    See Fed. from No. 24 to 28 inclusive on this subject.

The Constitution was adopted in ignorance, certainly, of any such power if it does exist, and it has required the lapse of three-quarters of a century to develop its latent evils. The usual evidences are all against the idea, and I think something more demonstrative will show that these evidences stand not alone against it.

A conscript is one taken by lot from the conscription (or enrolment) list, "and compelled to serve as a soldier or sailor." (Web. Dic. verb. "conscript.") The power to raise an army by conscription or coercion (the words are nearly synonymous) rests alone on the idea that the power is *unlimited*, as to the means to be used, as well as to the numbers of which it may be composed. If there was no other power or principle in the instrument to be affected in its operation by such a view, there would be force in the idea. But the Constitution must be administered so that the whole may stand in full force, unimpaired by any particular portion.

The limitation of a power may appear otherwise than by express terms. Its scope may be curtailed by the necessity to preserve some other function necessary to co-exist for preservation of the whole. One object in framing the Constitution, as already remarked, was to "perpetuate the blessings of liberty." It can hardly be contended for by any one, that the execution of a power which would effectually destroy this object would be constitutional. Again, a power so executed as to destroy the reserved rights of the States could hardly be claimed to be constitutional. There are, therefore, limitations as effectual as if expressed ; "*ut res magis valeat quam pereat*" is a maxim out of which this grows.

A limitation of this power was undoubtedly supposed to exist in the discretion of Congress; but that cannot be relied on in this argument. To give it any force would be to allow the acts of Congress to be evidence to establish the proper discretion of Congress. This would be to argue in a circle, and would prove nothing—we are testing the acts of Congress, not by Congress but by the Constitution. So, too, it was supposed to exist in a time when no more voluntary enlistments could reasonably be procured, or when they might not be procured rapidly enough. That this was so is demonstrable by the fact that the Constitution provides for calling out the militia when the army may not be sufficient. I use this contingent expression because I look on the army as an ordinary power, and ordinarily to be used unless insufficient for the end in view,

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

or the exigencies of the times.   However this may be, it is absolutely certain that the military forces of the government for all purposes were to be the army and the militia.

In the article of the Constitution containing the power to "raise and support armies," and consecutive to that and other war powers and as part of them, is the power to be found in Congress " to provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasion;" "To provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be *employed in the service* of the United States, reserving to the States, respectively, the appointment of officers, and the authority of training the militia according to discipline prescribed by Congress."

The army to be raised and the militia liable to be employed in the service of the United States, are the constituted military forces of the Government.   They co-exist, and must co-exist, if the Constitution be obligatory.   We sometimes employ volunteers, but they are merely a form, as they are a part, of the militia, and do not militate against the idea of the two species of forces.   It is conceded that both may not be required in any given case, but both must exist, or rather the militia cannot be destroyed or extinguished by an act of Congress.   The Constitution forbids this by the positive injunction to provide for organizing, arming, and disciplining them.   They are the security of the States against the Federal Government, and their only security; for the States themselves are not allowed to support armies.

"It may safely be received as an axiom in our political system," says the "Federalist," No. 28, "that the State governments will in all possible contingencies afford complete security against invasions of the public liberty by the national authority." * * "They can at once adopt a regular plan of opposition in which they can combine all the resources of the community!"   How can this security be afforded against the danger of invasion of the public liberty by the national authority, unless there be some military force with which to resist it?   What resources are there in a community, if all the " able-bodied men" may be absorbed in the national forces?   It will at once be agreed, I think, in view of the constitutional provisions cited, that the militia, the only power of the States, must be maintained in tact, and that no system is constitutional which extinguishes them.   Let us inquire, therefore, whether or not the act of Congress of the 3d of March, 1863, known as the conscription act, does not in fact attempt the complete demolition of the militia of the States.

The preamble to the act sets forth the existence of insurrec-

tion and rebellion; that'a military force is indispensable to suppress it; that to raise and support which "all persons ought willingly to contribute." It is therefore enacted, Sec. 1, "That all able bodied male citizens of the United States and persons of foreign birth who shall have declared on oath their intention to become citizens in pursuance of the laws thereof, between the ages of twenty and forty-five years, except as excepted, are hereby declared to constitute the *national forces*, and shall be liable to perform military duty in the service of the United States, when called out by the President for that purpose." Then follow numerous provisions for classifying them, for the lottery or draft of the required number in each military district, the closing up of the wheel until again required, and the order and term of service, not as militiamen belonging to and officered by the States, but as parcel of the army of the United States "raised and supported" under the clause of the Constitution which provides for raising and supporting armies, and to be officered by Federal authority exclusively.

Every able-bodied man in the United States, between twenty and forty-five, is by these provisions enrolled, and declared to constitute the national forces. This covers the entire *material* of the militia in the Union. All able-bodied white men between twenty-one and forty-five years are liable as militiamen in this commonwealth, and it is believed that this is about or near the standard in most, if not all the other States. This act is broader, both as to age and color. The specified age, however, amounts to nothing, for Congress, by a very slight extension of power in fixing the standard, could just as well have made it to include all between the ages of eighteen and sixty. Let the power be once established, the right must follow, and in this way every man in public or private life in a State between those ages might be included. No one is exempt under the present law but the Governor. All other officers, judges, legislators, representatives in Congress, sheriffs, magistrates, county and township functionaries of every description, if under forty-five, are liable now to be forced into the army, or to commute by the payment of $300, or to find substitutes. As it is, this would draw heavily upon the public, and necessary local officers—but if extended to the ages of *eighteen and sixty*, as it could as readily be made to do, it might include all, not excepting even the Governor. Can it be that the machinery of our government is so incongruous as to admit of this? Can it for a moment be believed that the framers of the Federal Constitution intended to create such a monstrous power? One that would not only absorb the military power of the State but the civil also? This is exactly the principle

[Kneedler *v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

of this enactment, and to a great extent will be the practical workings of it.

I hold that the act plainly and directly destroys the militia system ,of the States, as recognized in the Constitution, and the acts of Congress of 1792 and 1795. By its provisions the militia are to be enrolled as part of the *national forces*, another term, as will be seen, for national armies, and it requires each individual, so enrolled, to answer and report himself, when drawn, to the military officers of the Federal government, under the pains and penalties prescribed for desertion. If this is not taking possession of the entire *materiel* of the militia and consequently the militia itself bodily, I cannot comprehend the meaning or effect of language.

The direct object of the act is to constitute the national forces of the same material as that which constitutes the militia of the States, and for that purpose a Federal enrolment is made, and a portion so enrolled are drawn from the wheel and separately and individually transferred to the army of the United States to be commanded not by State, but by United States officers. They are henceforth not militiamen, but regulars. They are to be carried into the army under the power granted to Congress " to raise and support armies ;" not under that other power which authorizes Congress " to provide for calling out the militia to execute the laws, suppress insurrection and repel invasion." If called out in this capacity, it would be done by requisition of the President upon State authorities, at least, upon State military officers, and then the militia would come forth in organized bodies, not as individuals, and be officered by State authority. This is widely different from directing the Federal authority to each individual—to conscript him in his individual character, and to compel him to serve not with State contingents and under State officers, but under Federal or army officers.

In short, the provisions of the act incorporates into the Federal armies the entire material constituting the militia, by directing their authority to them individually, without a requisition on the States, and without any power in any State to appoint a single officer to command them, although the entire force was, by the Constitution, to be, when called into the service of the United States, under the military officers of the State. Such an act, disregarding such plain provisions of the Constitution, is certainly unconstitutional, if such a thing be possible, at all, of any act of Congress, and this view, if correct, establishes conclusively the limitation of the power to raise and support armies.

Those enrolled and not drawn out of the wheel at the first draft, remain subject to be called out afterward. They are the

[Kneedler *v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

*unemployed national forces,* and are declared to be subject to be called into service under the plan of the act for two years, after the 1st of July succeeding the enrolment, to serve for three years or during the war. It is true, when called into service, the act says they shall be "placed on the same footing in all respects as volunteers, including advance pay and bounty, as is now provided by law." I presume it is' not meant by this, that the conscripts are to elect their own officers. But even if this were so, it would be no less a deprivation of the right of the States to appoint the officers of their militia, and unconstitutional for that reason.

As the enrolment or conscription into the national forces for two years, although unemployed, is nevertheless an incorporation of them with the national forces, it is a withdrawal of them for that period from the control of the States. The act would be worth nothing if the States might resolve that this should not be. The act of Congress is supreme or it is nothing. If it be supreme, then the enrolled men can be and are directly under the Federal authority all the time, and thus every citizen or enrolled person, in or out of service, may be liable to be controlled by military law all the time, if Congress chooses. Can this be possible? What is to become of the States and their sovereignty, a matter often sneered at, but among the most distinct, clear, and cherished principles in the whole body of the Constitution? One portion of the militia conscripted and actually in the field, the balance conscripted and not yet in the field, but subject to the military authority of the United States, where are the militia and where is the security of the States against being entirely absorbed, and against invasions of the public liberty by the national authority, which the writers of the Federalist thought existed in the militia? It is neither in the field nor at home; it is abolished!

Apprehensions, doubtless, of just such an enactment as this now under consideration superinduced the introduction of the bill of rights by amendment and consent of two-thirds of the States, in which is the declaration, that "a well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."

I contend that the act of Congress under discussion, violates this declared right, by absorbing the militia into the army, as contra-distinguished from the militia; by taking all the material which constitutes the militia and calling them out individually without requisition on the States, and placing them under officers not chosen by the States.

It disregards the organization of the militia altogether, not

only in providing others than militia officers, but in its total disregard of State regulations and exemptions. Heads of departments of the States, judges of the several courts, ministers of the gospel, professors in colleges, school directors are exempt by our militia law. But the mode adopted for calling out the forces of the country, disregarding the militia system, disregards all these. These were within the militia, but as the militia itself is overthrown by the act in question, they fall with it. It is possible that this power may be exercised, and the States live through it, but although they may not fall, their foundations will be fatally sapped, and if the precedent remain, it will in time become the authority for their extinction.

The Constitution authorizes Congress to provide for calling out the militia to suppress insurrections and repel invasion." During the whiskey insurrection in this State, President Washington called upon the militia for this purpose, by a requisition on the Governor, and in person commanded them. So the militia were called out from many of the States during the war with Great Britain, and in every instance a requisition was made by the President upon the Governors of the States. It is true that in 1814, the question was much agitated in Congress whether or not, under the power to "raise armies," the militia might not be conscripted by the Federal authority. The bill which proposed this had the sanction of high names—but it differed much from this act, and was never finally acted on, because of the termination of the war by the peace of Ghent. The discussion on this bill was able, but partisan, and furnishes little aid to a judicial examination, and hence I have not recurred to it much in taking the view herein expressed. That a government like that of Great Britain may resort to conscription to fill the ranks of her armies, and has done so on many occasions, is no argument or precedent for that practice under the Federal Constitution. Even in England, this is far from the ordinary mode of recruiting the army, and it will hardly be contended that the exception to the rule will establish a custom, by which to define the meaning of the words "to raise and support armies," used in our Federal Constitution, so that ex vi termini, conscription or draft, both involuntary modes, were thereby meant.

But the precedent would go for nothing in this inquiry, even if the practice had been common in England. The difference between the construction of the British and Federal Constitutions is radical. In the former, all governmental powers not expressly prohibited to the government, may be lawfully exercised. In the latter, whatever power is not expressly granted is withheld. There is no grant of such a power to the latter,

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

as I have endeavored to show, and no restraint upon it in the former, as the exercise of it proves.

This remark is equally applicable to the difference between the State and Federal Constitution. Between them the same difference in construction exists. The governmental powers of the States extend to all rightful subjects, not prohibited—and the national only to such as are granted. It therefore does not advance the argument a step in favor of those who contend for the constitutionality of the Conscription Act, to point to instances in which drafts have been made by State authorities. Militia duty is compulsory in all the States. They are not prohibited from compelling it any more than from compelling the payment of the taxes. It is in this way, and in this way only, in my opinion, that the national forces can be compulsorily raised; that is to say, by a requisition on the State authorities for militiamen in a just proportion to population.

Why have not the militia been called out in the present emergency? They are composed of the men the draft proposes to furnish. They are to be governed, while in the service, as Congress shall prescribe. They may be retained for one, two, or three years, or while the insurrection lasts, and will become just as good soldiers in the one character as in the other, They are the constitutional power for that purpose, if the army be not sufficient to effect the object without them. Why not employ them? "There is but one of two alternatives," says Judge Story, "which can be resorted to in cases of insurrection, invasion, or violent opposition to the laws, either to employ regular troops or to employ the militia to suppress them." Story on Con., sec. 1201. If it be said that the militia will be inefficient, which I deny with equal training, I insist that the imperfection of the system is no justification for the overthrow, in part or in whole, of the Constitution.

There is nothing on earth that I so much desire as to witness the suppression of this unjustifiable and monstrous rebellion. It must be put down to save the Constitution, and the constitutional means for the purpose I believe to be ample, but we gain but little, if in our efforts to preserve it when assailed in one quarter, we voluntarily impair other portions of it. Its entirety is vital, it must all stand, or it will all fall; it can never be apportioned.

Believing that I have shown that the power "to raise and support armies" is limited to voluntary enlistments, and necessarily so limited that the militia of the States may remain in full force, I am impelled by no choice of alternatives, to the conclusion that as the act of Congress transcends these limits, and by force of law attempts to abolish the militia, instead of calling on them to suppress the insurrection now so wide-

[Kneedler *v*. Lane et al.    Smith *v*. Lane et al.    Nichols *v*. Lehman et al.]

spread, I am of opinion that the act of Congress is violative of the Constitution of the United States, and void.

I most sincerely confess that it would have been a much more agreeable duty to me to have been able at this time and at all times, to give my full accord to the measures resorted to to restore the peace and order of our once happy country ; but looking to the Constitution, at the reasons for its provisions, and then to the solemn obligation which I have voluntarily come under to support the Constitution, I cannot, even at the risk of misrepresentation of motives, hesitate, when the question is a judicial one, to express my unmixed convictions as I have done, of the enactment in question.

Standing recently on the gentle slopes at Runnymede, memory sent a thrill to my heart in admiration of those old Barons who stood up there and demanded from a tyrannical sovereign that the lines between power and right should be then and there distinctly marked, and all my feelings at the moment paid an involuntary tribute of regard to the fidelity with which their descendants have continued to maintain what they there demanded and obtained, although often overshadowed by insurrection and war.   Our forefathers marked these lines in the Federal Constitution.   I must adhere to them.   I cannot help it, and while I live I trust to Heaven that I may have the strength to say that I will ever do so.

There is no legal authority, in my opinion, in the officers of the Government to hold the complainant against his consent.   I am therefore in favor of enjoining them as prayed for until further hearing, and I agree to the same order in the other cases.

Justices STRONG and READ dissented from the foregoing opinions, and the ruling of the majority of the court—holding the Conscription law of March 3d, 1863, to be constitutional, and delivered the following dissenting opinions :—

STRONG, J.—The complainants having been enrolled and drafted, under the provisions of the act of Congress of March 3d, 1863, entitled   "An act for enrolling and calling out the national forces, and for other purposes," have presented their bills in this court against the persons who constitute the board of enrolment, and against the enrolling officers ; praying that they may be enjoined against proceeding under the act of Congress, with the requisition, enrolment, and draft of citizens of the commonwealth, and of persons of foreign birth who have declared their intention to become citizens under and in pursuance of the laws to perform compulsory military duty in the service of the United States, and particularly that the defendants may be enjoined from all proceedings against the persons of the complainants, under pretence of executing the said law

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

of the United States. The bills having been filed, motions are now made for preliminary injunctions, until final hearing. These motions have been argued only on the part of the complainants. We have, therefore, nothing before us but the bills and the special affidavits of the complainants.

It is to be noticed that neither the bills nor the accompanying affidavits aver that the complainants are not subject to enrolment and draft into the military service of the United States, under the act of Congress, if the act be valid ; nor is it asserted that they have been improperly or fraudulently drawn. It is not alleged that the defendants have done anything, or that they propose to do anything not warranted or required by the words and spirit of the enactment. The complainants rest wholly upon the assertion that the act of Congress is unconstitutional, and, therefore, void. It is denied that there is any power in the Federal government to compel the military service of a citizen by direct action upon him, and it is insisted that Congress can constitutionally raise armies in no other way than by voluntary enlistments.

The necessity of vesting in the Federal government power to raise, support, and employ a military force was plain to the framers of the Constitution, as well as to the people of the States by whom it was ratified. This is manifested by many provisions of that instrument, as well as by its general purpose, declared to be for " common defence." Indeed, such a power is necessary to preserve the existence of any independent government, and none has ever existed without it. It was, therefore, expressly ordained in the eighth article that the Congress of the United States should have power to "provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions." It was also ordained that they should have power to provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the States respectively the appointment of the officers and the authority of training the militia according to the discipline prescribed by Congress. Nor is this all. It is obvious that if the grant of power to have a military force had stopped here, it would not have answered all the purposes for which the government was formed. It was intended to frame a government that should make a new member in the family of nations. To this end, within a limited sphere, every attribute of sovereignty was given. To it was delegated the absolute and unlimited power of making treaties with other nations—a power explicitly denied to the States. This unrestricted power of making treaties involved the possibility of offensive and defensive alliances. Under

such treaties the new government might be required to send armies beyond the limits of its territorial jurisdiction.    And, in fact, at the time when the Constitution was formed, a treaty of alliance, offensive and defensive, was in existence between the old Confederacy and the government of France.    Yet more.    Apart from the obligations assumed by treaty, it was well known that there are many cases where the rights of a nation and its citizens cannot be protected or vindicated within its own boundaries.    But the power conferred upon Congress over the militia is insufficient to enable the fulfilment of the demands of such treaties, or to protect the rights of the government, or its citizens, in those cases in which protection must be sought beyond the territorial limits of the country.    The power to call the militia into the service of the Federal government is limited by express terms.    It reaches only three cases.    The call may be made " to execute the laws of the Union, to suppress insurrections, and to repel invasions, and for no other uses. ` The militia cannot be summoned for the invasion of a country without the limits of the United States.    They cannot be employed, therefore, to execute treaties, of offensive alliance, nor in any case where military power is needed abroad, to enforce rights necessarily sought in foreign lands.    This must have been understood by the framers of the Constitution, and it was for such reasons, doubtless, that other powers to raise and maintain a military force were conferred upon Congress, in addition to those which were given over the militia.    By the same section of the eighth article of the Constitution, it was ordained, in words of the largest meaning, that Congress should have power to "raise and support armies"—a power not to be confounded with that given over the militia of the country. Unlike that, it was unrestricted, unless it be considered a restriction that appropriations of money to the use of raising and supporting armies were forbidden for a longer term than two years.    In one sense this was a practical restriction. Without appropriations no army can be maintained, and the limited period for which appropriations can be made enables the people to pass judgment upon the maintenance and even existence of the army every two years, and in every new Congress.    But in the clause conferring authority to raise armies, no limitation is imposed other than this indirect one, either upon the magnitude of the force which Congress is empowered to raise, or upon the uses for which it may be employed, or upon the mode in which the army may be raised.    If there be any restriction upon the mode of exercising the power, it must be found elsewhere than in the clause of the Constitution that conferred it.    And if a re-

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

stricted mode of exercise was intended, it is remarkable that it was not expressed, when limitations were so carefully imposed upon the power given to call forth the militia—and, more especially, when, as it appears from the prohibition of appropriations for the army for a longer time than two years, the subject of limiting the power was directly before the minds of the authors of the Constitution.

This part of the Constitution, like every other, must be held to mean what its framers, and the people who adopted it, intended it should mean. We are not at liberty to read it in any other sense. We cannot insert restrictions upon powers given in unlimited terms, any more than we can strike out restrictions imposed.

There is sometimes great confusion of ideas in the consideration of questions arising under the Constitution of the United States, caused by misapprehension of a well-recognized and oft-repeated principle. It is said, and truly said, that the Federal government is one of limited powers. It has no other than such as are expressly given to it, and such as (in the language of the Constitution itself) " are necessary and proper for carrying into execution" the powers expressly given. By the tenth article of the amendments, it is ordained that the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people. Of course there can be no presumption in favor of the existence of a power sought to be exercised by Congress. It must be found in the Constitution. But this principle is misapplied when it is used, as is sometimes the case, to restrict the right to exercise a power expressly given. It is of value when the inquiry is whether a power has been conferred, but of no avail to strip a power given in general terms, of any of its attributes. The powers of the Federal government are limited in number, not in their nature. A power vested in Congress is as ample as it would be if possessed by any other legislature, none the less because held by the Federal government. It is not enlarged or diminished by the character of its possessor. Congress has power to borrow money. Is it any less than the power of a State to borrow money? Because the Federal government has not all the powers which a State government has, will it be contended that it cannot borrow money, or regulate commerce, or fix a standard of weights and measures, in the same way, by the same means, and to the same extent as any State might have done had no Federal Constitution ever been formed ? If not, and surely this will not be contended, why is not the Federal power to raise armies as large and as unfettered in the mode in which it may be exercised, as was the power to raise armies

possessed by the States before 1787, and possessed by them now, in time of war? If they were not restricted to voluntary enlistments in procuring a military force, upon what principle can Congress be? In *Gibbons* v. *Ogden*, 9 Wheaton, 196, the Supreme Court of the United States laid down the principle that all the powers vested by the Constitution in Congress are complete in themselves, and may be exercised to their utmost extent, and that there are no limitations upon them, other than such as are prescribed in the Constitution.

It is not difficult to ascertain what must have been intended by the founders of the government when they conferred upon Congress the power to "raise armies." At the time when the Constitution was formed, and when it was submitted to the people for adoption, the mode of raising armies by coercion, by enrolment, classification, and draft, as well as by voluntary enlistment, was well known, practised in other countries, and familiar to the people of the different States. In 1756, but a short period before the Revolutionary war, a British statute had enacted that all persons without employment might be seized and coerced into the military service of the kingdom. The act may be found at length in Ruffhead's British Statutes at Large, vol. 7, p. 625. Another act of a similar character was passed in 1757, British Statutes at Large, vol. 8, p. 11. Both were enacted under the administration of William Pitt, afterwards Lord Chatham, reputed to have been one of the stanchest friends of English liberties. They were founded upon a principle always recognized in the Roman empire, and asserted by all modern civilized governments, that every able-bodied man capable of bearing arms, owes personal military service to the government which protects him. Lord Chatham's acts were harsh and unequal in their operations, much more so than the act of Congress now assailed. They reached only a select portion of the able-bodied men in the community, and they opened wide a door for favoritism and other abuses. For these reasons they must have been the more prominently before the eyes of the framers of the Federal Constitution, when they were providing safeguards to liberty, and checks to arbitrary power. Yet, in full view of such enactments, they conferred upon Congress an unqualified power to raise armies. And, still more than this, coercion into military service by classification and draft from the able-bodied men of the country, was to them a well-known mode of raising armies in the different States which confederated to carry on the Revolutionary war. It was equally well known to the people who ordained and established the Constitution, expressly "in order to form a more perfect union, establish justice, ensure domestic tranquillity, provide for the common defence, and secure the blessings

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

of liberty for themselves and their posterity." It is an historical fact, that during the later stages of the war, the armies of the country were raised, not alone by voluntary enlistments, but also by coercion, and that the liberties and independence sought to be secured by the Constitution were gained by soldiers made such, not by their own voluntary choice, but by compulsory draft. Chief Justice Marshall, himself a soldier of the Revolution, than whom no one was better acquainted with revolutionary history, in his Life of Washington (vol. 4, p. 241), when describing the mode in which the armies of the government were raised, makes the following statement: "In general the assemblies (of the States) followed the example of Congress, and apportioned on the several counties within the States the quota to be furnished by each. This division of the State was again to be subdivided into classes, and each class was to furnish a man by contributions or taxes imposed on itself. In some instances a draft was to be used in the last resort." This mode of recruiting the army by draft, in revolutionary times, is also mentioned in Ramsey's Life of Washington (vol. 2, p. 246), where it is said, "When voluntary enlistments fell short of the proposed numbers, the deficiencies were, by the laws of the several States, to be made up by drafts, or lots, from the militia."

Thus, it is manifest that when the members of the convention proposed to confer upon Congress the power to raise armies, in unqualified terms, and when the people of the United States adopted the Constitution, they had in full view compulsory drafts from the population of the country, as a known and authorized mode of raising them. The memory of the Revolution was then recent. It was universally known that it had been found impossible to raise sufficient armies by voluntary enlistment, and that compulsory draft had been resorted to. If, then, in construing the Constitution, we are to seek for and be guided by the intentions of its authors, there is no room for doubt. Had any limitation upon the mode of raising armies been intended, it must have been expressed. It could not have been left to be gathered from doubtful conjecture. It is incredible that when the power was given in words of the largest signification, it was meant to restrict its exercise to a solitary mode—that of voluntary enlistment, when it was known that enlistments had been tried and found ineffective, and that coercion had been found necessary. The members of the convention were citizens of the several States, each a sovereign, and each having power to raise a military force by draft, a power which more than one of them had exercised. By the Constitution, the authority to raise such a force was to be taken from the States partially, and delegated to the new government

about to be formed.   No State was to be allowed to keep troops in time of peace.   The whole power of raising and supporting armies, except in time of war, was to be conferred upon Congress.   Necessarily with it was given the means of carrying it into full effect.

I agree that Congress is not at liberty to employ means for the execution of any powers delegated to it that are prohibited by the spirit of the Constitution, or that are inconsistent with the reserved rights of the States, or the inalienable rights of a citizen.   The means used must be lawful means.   But I have not been shown, and I am unable to perceive, that compelling military service in the armies of the United States, not by arbitrary conscription, but, as this act of Congress directs, by enrolment of all the able-bodied male citizens of the United States, and persons of foreign birth who have declared their intention to become citizens, between the ages of twenty and forty-five (with some few exceptions), and by draft by lot from those enrolled, infringes upon any reserved rights of the States or interferes with any constitutional right of a private citizen. If personal service may be compelled—if it is common duty— this is certainly the fairest and most equal mode of distributing the public burden.

It was urged in the argument that coercion of personal service in the armies is an invasion of the right of civil liberty. The argument was urged in strange forgetfulness of what civil liberty is.   In every free government the citizen or subject surrenders a portion of his absolute rights in order that the remainder may be protected and preserved.   There can be no government at all where the subject retains unrestrained liberty to act as he pleases, and is under no obligation to the State. That is undoubtedly the best government which imposes the fewest restraints, while it secures ample protection to all under it. But no government has ever existed, none can exist, without a right to the personal military services of all its able-bodied men.   The right to civil liberty in this country never included a right to exemption from such service.   Before the Federal Constitution was formed, the citizens of the different States owed it to the governments under which they lived, and it was exacted.   The militia systems of the States then asserted it, and they have continued to assert it ever since.   They assert it now.   No one doubts the power of a State to compel its militia into personal service, and no one has ever contended that such compulsion invades any right of civil liberty.   On the contrary, it is conceded that the right to civil liberty is subject to such power in the State governments, and the history of the period immediately antecedent to the adoption of the Federal Constitution shows that it was then admitted.   Is civil

[Kneedler *v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

liberty now a different thing from what it was when the Constitution was formed? It is better protected by the provisions of the Constitution, but are the obligations of a citizen to the government any less now than they were then? This cannot be maintained. If, then, coercion into military service was no invasion of the rights of civil liberty enjoyed by the people of the States before the Federal Constitution had any existence, it cannot be now.

Again, it is insisted that if the power given to Congress to raise and support armies be construed to warrant the compulsion of citizens into military service, it must with equal reason be held to authorize arbitrary seizures of property for the support of the army. The force of the objection is not apparent. Confessedly the army must be raised by legal means. By such means it must also be supported. It has already been shown that enrolment and draft are not illegal; that to make them illegal a prohibition must be found in the letter or in the spirit of the Constitution. Arbitrary seizures of private property for the support of the army are illegal and prohibited. Not only does the Constitution point out the mode in which provision shall be made for the support of the army, but in numerous provisions it protects the people against deprivation of property without compensation and due course of law. Exemption from such seizures was always an asserted and generally an admitted right, while exemption from liability to being compelled to the performance of military service was, as has been seen, never claimed. There are, therefore, limitations upon the means which may be used for the support of the army, while none are imposed upon the means of raising it.

Again, it is said this act of Congress is a violation of the Constitution, because it makes a drafted man punishable as a deserter before he is mustered into service. The contrary was declared by Chief Justice Marshall, when delivering the judgment of the Supreme Court of the United States in *Houston* v. *Moore*, 5 Wheaton. Under the act of 1795 the drafted men were not declared to be subject to military law until mustered into service. This is the act of which Judge Story speaks in his commentaries. But in the opinion of Judge Marshall, Congress might have declared them in service from the time of the draft, precisely what this act of Congress does. Judge Marshall's opinion, of course, explodes this objection.

The argument most pressed in support of the alleged unconstitutionality of the act of Congress, is that it interferes with the reserved rights of the States over their own militia. It is said the draft takes a portion of those who owe militia service to the States, and thus diminishes the power of the States to protect themselves. The States, it is claimed, retain the prin-

cipal power over the militia, and therefore the power given to Congress to raise armies must be so construed as not to destroy or impair that power of the State. If, say the complainants, Congress may draft into their armies, and compel the service of a portion of the State militia, they may take the whole, and thus the entire power of the States over them may be annulled for want of any subject upon which it can act. I have stated the argument quite as strongly as it was presented. It is more plausible than sound. It assumes the very matter which is the question in debate. It ignores the fact that Congress has *also* power over those who constitute the militia. The militia of the States is also that of the general government. It is the whole able-bodied population capable of bearing arms, whether organized or not. Over it certain powers are given to Congress, and others are reserved to the States. Besides the power of calling it forth, for certain defined uses, Congress may provide for its organization, arming and discipline, as well as for governing such portion as may be employed in its service. It is the material, and the only material, contemplated by the Constitution, out of which the armies of the Federal government are to be raised. Whether gathered by coercion or enlistment, they are equally taken out of those who form a part of the militia of the States. Taking a given number by draft no more conflicts with the reserved power of the States than does taking the same number of men in pursuance of their own contract. No citizen can deprive a State of her rights without her consent. None could, therefore, voluntarily enlist, if taking a militiaman into military service in the army of the United States is in conflict with any State rights over the militia. Those rights, whatever they may be, it is obvious, cannot be affected by the mode of taking. It is clear that the States hold their power over the militia, subordinate to the power of Congress to raise armies out of the population that constitutes it. Were it not so, the delegation of the power to Congress would have been an empty gift. Armies can be raised from no other source. Enlistments in other lands are generally prohibited by foreign enlistment acts, and even where they are not, they may, under the law of nations, involve a breach of neutrality.

Justly, therefore, may it be said, the objection now under consideration begs the question in debate. It assumes a right in the State, which has no existence, to wit: a right to hold all the population that constitutes its militiamen exempt from being taken, in any way, into the armies of the United States. When it is said, if any portion of the militia may be coerced into such military service, the whole may, it is but a repetition of the common but very weak argument against the existence of a power because it may possibly be abused. It might with

equal force be urged against the existence of any power in either the State or general governments. It applies as well to a denial of power to raise armies by voluntary enlistment. It is as conceivable that high motives of patriotism, or inducements held out by the Federal government might draw into its military service the entire able-bodied population of a State, as that the whole might be drafted. We are not to deny the existence of a power because it may possibly be unwisely exercised, nor are we to presume that abuses will take place. Especially are we not at liberty to do so in this case, in view of the fact that the general government is under constitutional obligations to provide for the common defence of .the country, and to guaranty to each State a republican form of government. That would be to impose a duty and deny the power to .perform it. ·

These are all the objections deserving of notice that have been used against the power of Congress to compel the complainants into military service in the army. I know of no others of any importance. They utterly fail to show that there is anything in either the letter or the spirit of the Constitution to restrict the power to " raise armies," given generally, to any particular mode of exercise. For the reasons given, then, I think the provisions of the act of Congress under which these complainants have been enrolled and drafted, must be held to be such as it is within the constitutional power of Congress to enact. It follows that nothing has been done or is proposed to be done by the defendants that is contrary to law or prejudicial to the rights of the complainants.

An attempt was made on the argument to maintain that these provisions of the act of Congress which allow a drafted man to commute by the payment of $300, are in violation of the Constitution. But this is outside of the cases before us. By these provisions the complainants are not injuriously affected, and the bills do not.complain of anything done or proposed to be done under them. It is the compulsory service which the plaintiffs resist; they do not complain that there is a mode provided of ridding themselves of it. If it be conceded Congress cannot provide for commutation of military service by the payment of a stipulated sum of money, or cannot do it in the way adopted in this enactment, the concession in no manner affects the directions given for compulsion into service. Let it be that the provision for commutation is unauthorized, those for enrolment and draft are such as Congress had power to enact. It is well settled that part of the statute may be unconstitutional and the remainder in force. I by no means, however, mean to be understood as conceding that any part of this act is unconstitutional. I think it might easily

be shown that every part of it is a legitimate exercise of the power vested in Congress, but I decline to discuss the question, because it is not raised by the cases before us.

Nor while holding the opinions expressed, that no rights of the complainants are unlawfully invaded or threatened, is it necessary to consider the power or propriety of interference by this court, on motion, to enjoin Federal officers against the performance of a duty imposed upon them in plain terms by an act of Congress.   Upon that subject I express no opinion.   I have said enough to show that the complainants are not entitled to the injunctions for which they ask, and I think they should be denied.

Dissenting opinion delivered November 9, 1863, by

READ, J.—The power of the government of the United States extends over all the States and Territories of the Union. It has no rival in the State governments, whose power is strictly confined to their own territorial limits.   It is the only representative of the people recognized by foreign nations, in their various relations with us, in time of war and peace.   All the powers, therefore, vested in the national government are necessarily supreme and paramount, and cannot be rightfully disobeyed by her citizens.   This general government has the sole and exclusive power of declaring war and making peace, of raising and supporting armies, of providing and maintaining a navy, of laying and collecting taxes, duties, imposts, and excises, to pay the debts, and provide for the common defence and general welfare of the United States, and of borrowing money on the credit of the United States.   The avowed object of these and other powers, vested in the general government, was to form a more perfect union, establish justice, *insure domestic tranquillity*, provide for the common defence, promote the general welfare, and insure the blessings of liberty to the people of the United States and their posterity.   It was therefore solemnly declared, and made a fundamental article of the national Constitution, that the Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

The power to raise armies for the United States being vested solely in Congress, the legislative branch of the government, it must " exist without limitation; because it is impossible to foresee or to define the extent and variety of national exigencies, and the correspondent extent and variety of the means

which may be necessary to satisfy them.   The circumstances that endanger the safety of nations are infinite; and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed.   This power ought to be coextensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils which are appointed to preside over the common defence."   1 Federalist, No. 23.

"The result from all this is, that the Union ought to be invested with full power to levy troops, to build and equip fleets, and to raise the revenues which will be required for the formation and support of an army and navy in the customary and ordinary modes practised in other governments," id. p. 151; and "there can be no limitation to that authority which is to provide for the defence and protection of the community in any manner essential to its efficacy, that is, in any manner essential to the *formation, direction, or support of the* NATIONAL FORCES." Id. p. 150.   The necessity of employing a regular force in case of seditions and insurrections is forcibly portrayed in the 28th number of "The Federalist."

No person is naturally exempted from taking up arms in defence of the State—the obligation of every member of society being the same.   Those alone are excepted who are incapable of· handling arms or supporting the fatigues of war.   This is the reason why old men, children, and women are exempted. "The clergy cannot naturally and as a matter of right arrogate to themselves any peculiar exemption.   To defend one's country is an action not unworthy of the most sacred hands."   Vattel, book 3, ch. 2, s. 10. ed. 1760; 2 Burlamaqui, Politic. Law, part 4, ch. 1, s. 14, p. 158.

Every citizen is bound to *serve* and defend the state as far as *he is capable;* and it would seem that the duty incumbent on every citizen to defend his country, as well from foreign aggression or injury as from intestine disorder, was fully recognized by the common law.   Vattel, id. s. 8; Bowyer's Const. Law of England, p. 484.

In the first Constitution of Pennsylvania, and in those of several other States, the duty of the citizen to yield his personal service when necessary, or an equivalent thereto, is distinctly asserted.   This is the more remarkable in our State, as, owing to the preponderating influence of the Society of Friends, the colony had no efficient militia law, at any time, and in the earlier and later periods of its history, none at all.   In 1756 the Assembly prepared a new militia bill, by which all the male inhabitants were subjected to. military duty, commutable for a fine in the ordinary courts of justice.   The officers, however, were still elective, for which reason the Governor ob-

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

jected to the bill.   He also required that persons alleging conscientious scruples against bearing arms should appear in open court and declare to what society they belonged; that they were truly and religiously opposed to war; and that a court martial should be authorized to punish, by death or otherwise, as was provided by the English militia bill.   But the house, unwilling to strengthen the hands of the executive by giving him the appointment of the officers, and to lodge such powers in courts-martial, refused to remodel their bill.   Gordon's Hist. of Penn., p. 340.

The battle of Lexington having roused the indignation of the people, the Committee of Correspondence of the city and county of Philadelphia, to supply the want of a militia law, called a meeting of the citizens, who resolved to form a military association for the protection of their property, their liberty, and their lives.   This association extended through every county of the province, its members furnishing themselves with the necessary arms.   The Assembly approved the association, and engaged to provide for the pay and sustenance of those called into actual service.   The Committee of Public Safety prepared articles for the government of this military association, but the citizens refused to sign them, alleging that many persons, rich and able to perform military duty, claimed exemption under pretence of conscientious scruples.   Both parties addressed the Assembly, the Committee of Correspondence, and of the officers and soldiers of the military association, saying emphatically, "Be this as it may, self-preservation is the first duty of nature, which every man indispensably owes, not only to himself, but to the Supreme Director and Governor of the universe, who gave him being.   In political society all men by the original compact are required to unite in the defence of the community against such as would unlawfully deprive them of their rights, and those who withdraw themselves from this compact are not entitled to the protection of the society.   The safety of the people is the supreme law.   He who receives an equal benefit should bear an equal burden."

The Assembly, April 5, 1776, imposed a fine on all able-bodied effective male white persons capable of bearing arms, not associators, between the ages of sixteen and fifty years; ministers of the gospel of all denominations, schoolmasters in actual employ; and servants purchased *bona fide* and for a valuable consideration, only excepted, which fine was largely increased by the first Assembly under the State Constitution.   14 February, 1777, McKean's ed. p. 22.

The revolutionary Congress was a body entirely dependent on the will of the several States, and the good feeling of their citizens; for the Articles of Confederation were not finally rati-

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.,   Nichols *v.* Lehman et al.]

fied by all the States until the 1st of March, 1781. The Congress assigned the quota of troops to the several States, and they followed the example by apportioning to the several counties the quota.to be furnished by each. This division of the State was again to be subdivided into classes, and each class was to furnish a man by contribution or taxes imposed. In some instances a draft was to be used in the last resort. Pennsylvania concentrated the requisite power in the President, Mr. Reed, and authorized him to draw forth the resources of the State, under certain limitations, and, if necessary, to declare martial law over the State.* Bradford's Hist. of Mass., p. 211; 4 Marshall's Life of Washington, p. 241; 8 Penna. Archives, p. 267; 3 Hildreth's Hist. U. S. pp. 273, 310, 316; 2 Ramsay's Life of Washington, p. 246; 3 Gordon's Hist. U. States, p. 62.

The Articles of Confederation did not really increase the powers of Congress, for the land forces were to be raised by the several States upon requisitions for their several quotas, and the legislature of each State was to appoint the regimental officers, raise the men, and clothe and arm and equip them in a soldierlike manner, at the expense of the United States, and march them to the place appointed. All the action therefore of the Confederacy was upon the States, and not upon the people, and its entire inadequacy to fulfil the purposes of a general government was felt and acknowledged by all reflecting men. It was simply a confederacy, while the Constitution of 1787 is a truly national government, acting not upon the State governments, but directly upon the people of the United States, as a nation, by whose free will it was established.

The power, therefore, to raise and support armies was from sheer necessity given to Congress, for it was a right which could not, from the nature of things, be reserved to the people, nor to the States, who could not step beyond their own narrow limits. It is clear, then, that whatever means might be required to raise an army, could be used by the Congress, and they were the sole judges of its expediency and propriety. Now there is not a word in the Constitution limiting the natural power of the government over its citizens, to oblige them to render personal service as soldiers, nor is there a single phrase implying that they can only be compelled to serve when they choose to do so by voluntary enlistment.

The plan of General Knox, Secretary of War, submitted to Congress by General Washington (18 Jan. 1790, 21 Jan. 1790) contemplated as liable to service all persons between the ages of eighteen and sixty, and stated certain general principles on

* President Reed proclaimed martial law on 9th June, 1780.   Penna. Journal, 21st June, 1780.

which it was formed; the fourth is in these words: "That every man of the proper age and ability of body is firmly bound, by the social compact, to perform personally his proportion of military duty for the defence of the state." 7 Niles' Reg. 296.

Rhode Island was the last State which ratified the Constitution. On the 29th May, 1790, their convention made a declaration of rights, the 18th paragraph of which was: "That any person religiously scrupulous of bearing arms ought to be exempted upon payment of an equivalent, to employ another to bear arms in his stead." 1 Elliot's Deb. 371. They, at the same time, proposed certain amendments to the Constitution, the sixth of which was: "That no person shall be compelled to do military duty otherwise than by voluntary enlistment, except in cases of general invasion, anything in the second paragraph of the sixth article of the Constitution, or any law made under the Constitution, to the contrary notwithstanding." Id. 372.

The works of Burlamaqui, Montesquieu, Puffendorf, Grotius, Locke, Vattel, and all the writers on government and the laws of nations, were familiar to the statesmen of the Revolution, and were largely used in their discussions, which from necessity involved the fundamental principles of civil society. Votes of Assembly, 1776 to 1780, p. 3, &c. No one, for instance, can read the second chapter of the third book of Vattel's Law of Nations, without seeing that the clause to raise and support armies, and the consequent power to oblige every able-bodied man to become a soldier, is but an embodied expression of the sound views of this enlightened writer. The very volume I quote from bears the marks of the studies, most probably, of some of the great men who framed the Constitution, and to whom the use of the library had been tendered. Vattel, Book iii. ch. 2, vol. 2, p. 3, &c., ed. 1760, in Phila. Library.

There can, therefore, be no doubt that the contemporaneous construction of this clause was that adopted by General Knox and approved by President Washington, particularly when we advert to the amendment of Rhode Island, proposed four months afterwards, to confine this compulsory power to cases of general invasion.

In the second war of independence, Mr. Monroe, then Secretary of War, with the approbation of Mr. Madison, a framer of the Constitution, and one of the authors of The Federalist, proposed a plan to Congress, by which the free male population of the United States, between eighteen and forty-five years, should be formed into classes of one hundred men, each class to furnish — men for the war, within thirty days after the classification, and replace them in the event of any casualty. 7 Niles' Reg. 137, 17 Oct. 1814; Id. 139. If any class failed to provide

the men required of it, within the time specified, they should be raised by draft on the whole class, any person thus drafted being allowed to furnish a substitute. This, therefore, was a compulsory draft, and the argument of Mr. Monroe in favor of the power of Congress, is clear, full, and exhaustive, and never has been answered. (See Note A.)

It was opposed by the peace men of that day, gentlemen who favored the Hartford Convention, and who were entirely opposed to the general administration, and the further prosecution of the war. Mr. Charles J. Ingersoll supported the measure in a very able speech, and, after a lapse of thirty-seven years, his deliberate judgment was in favor of its constitutionality. 3 Annals of 13th Congress, 807. Ingersoll's Hist. of Second War, 2d series, vol. 2, ch. 7. The war was drawing near to a close, all parties expected peace, and the news of it in February, 1815, stopped all further warlike preparations.

In the State of New York, then strongly in favor of the administration and the vigorous prosecution of the war, at a special session of the legislature called by Governor Tompkins, Mr. Van Buren introduced a bill into the Senate to raise twelve thousand men by drafting, and placing them in the service of the United States, which, after being amended, became a law on the 24th of October, 1814. It was stigmatized as a conscription bill by the opposition, and in the Council of Revision, Chancellor Kent reported objections, the first of which was " Because the Constitution of the United States has granted to Congress the power to raise and support armies, and with it the exclusive power to lay and collect imposts, and the concurrent power *to lay and collect taxes, duties, and excises, in order to provide for the common defence and general welfare.*" Street's New York Council of Revision, 443. These objections were, however, overruled by Governor Tompkins, Chief Justice Thompson, and Spencer and Yates, Justices of the Supreme Court, and the bill became a law. The same legislature passed an act to raise a corps of four thousand sea fencibles, and also an act for raising two regiments of men of color.

Governor Tompkins was an ardent supporter of the war and a most popular executive, and was rewarded by a grateful people by being twice elected to the high office of Vice-President of the United States.

A bill of a similar character was introduced into the Senate of Pennsylvania, entitled " An act to raise for a limited time a military force," which passed that body by a vote of twenty-one to nine, but was lost in the House. Mr. Nicholas Biddle, then a member of the Senate from Philadelphia, made a very able speech in favor of the bill, and voted for it. Senate Journal, 1814; Lowrie's Rep. 49, id. 75, id. 135; Aurora, Jan. 21, 1815.

[Kneedler *v*. Lane et al.   Smith *v*. Lane et al.   Nichols *v*. Lehman et al.]

On the 3d March, 1863, Congress passed "An act for enrolling and calling out the national forces, and for other purposes," by which all able-bodied male citizens, and persons of foreign birth who shall have declared on oath their intention to become citizens, between the ages of twenty and forty-five years, except as therein excepted, are declared to constitute the national forces, and to be liable to perform military duty in the service of the United States when called out by the President for that purpose. These forces were divided into two classes. Those who were drawn by lot, after having been regularly enrolled, unless exempted by law, were either to serve as soldiers, or to procure substitutes, or to pay three hundred dollars. The service is, therefore, compulsory, or in the words of the declaration of rights to our first Constitution, the drafted man must yield his "personal service," or " an equivalent thereto," for Congress has decided it necessary. I cannot, therefore, doubt that this act of Congress, in the present situation of the country, is a clearly constitutional exercise of power by the supreme legislature of the Union. This is the view entertained by two judges of the United States courts, both men of eminent learning and talents, and living in different districts—I mean Judge Betts, of New York, and Judge Cadwalader, of Pennsylvania. Washington Chronicle, Sept. 19, 1863; 20 Legal Intelligencer, 300.

If there ever was an occasion to call every man into the service of his country, it is the present one, when we are engaged in combating the most formidable, wicked, and causeless rebellion known in history, of which the object of its traitorous leaders is to destroy the Union, to erect a purely slave confederacy, and to make Pennsylvania a border State, exposed to the annual inroads of unprincipled enemies. I am, therefore, for using the whole population, if necessary, of the loyal States, to extinguish this treasonable rebellion. I have no idea of allowing Northern sympathizers to stay at home, whilst loyal men fight their battles and protect their property. I would oblige all such men to render their full share of military service, and if I had the power, I would place the New York rioters in the front ranks of the army.

We have, however, been referred to the example of England, as showing that the framers of the Constitution contemplated the armies of the Union should only be raised by voluntary enlistment. This has been said without a sufficient examination of the acts of the English Parliament, all of which were perfectly familiar to our revolutionary statesmen.

In 1704, 1756, 1757, 1778, and 1779, acts were passed for recruiting of His Majesty's land forces and marines, directing a speedy and effectual levy of able-bodied men to serve as soldiers. The commissioners under these acts were required to

.[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

levy and raise all able-bodied idle and disorderly persons who cannot, upon examination, prove themselves to exercise and industriously follow some lawful trade or employment, or *to have some substance sufficient for their support and maintenance*, to serve His Majesty as soldiers.   4 Anne, ch. 10; 29 Geo. 2, ch. 4; 30 Geo. 2, ch. 8; 18 Geo. 3, ch. 53; 19 Geo. 3, ch. 10.   If, upon their delivery to the military officers, such men shall appear more proper for service by sea than by land, they may be delivered over to any commissioned officer of His Majesty's fleet, to serve as common sailors.   None were to be impressed under sixteen or above the age of fifty, or who had a vote in the election of members of Parliament.

If an able-bodied man had sufficient substance, however idle and disorderly he might be, he could not be impressed, and the evident object of these acts was to force the poor man to serve at all events, and never to call compulsorily upon the nobility and gentry and the middle classes of the kingdom. Lord Mahon gives a strong instance of this in the case of a gentleman being by some mistake *pressed for a foot soldier*, and confined in the Savoy, and as the habeas corpus act of Charles the Second applied only to criminal cases, could only be released from imprisonment upon an application to the Secretary of War.   Lord Mahon's Hist. vol. 2, p. 255, 1758.

Impressment for the navy has always existed in England. In speaking of these modes of raising men for the army and navy, a very able writer of the present day says, "But perhaps the greatest anomaly in our laws—the most signal exception to personal freedom—is to be found in the *custom of impressment* for the land and sea service.   There is nothing incompatible with freedom in a conscription or forced levy of men for the defence of the country.   It may be submitted to in the freest republic like the payment of taxes.   The service of every subject may be required in such form as the state determines.   But impressment is the arbitrary and capricious seizure of individuals from among the general body of citizens. It differs from conscription as a particular confiscation differs from a general tax.   2 May's Const. History of England, p. 259.

In England, when the militia cannot be filled by volunteers, the men (the privates) are selected by a compulsory ballot, and by an act of 30th June, 1852, the Queen was authorized to raise eighty thousand private militiamen, which might be increased to one hundred and twenty thousand.   14 Law Magazine, p. 58; 21 Stat. at L. p. 90.

In fact, conscription, or its equivalent, has been resorted to by every civilized nation.   The English government have never had in any single portion of the world in active service a native army much exceeding sixty thousand, the number which in-

vaded France in 1814, whilst the armies of the other allied powers amounted to a million of men.

The present rebellion, according to Lord Coke, is a war. " So when by invasion, insurrection, rebellion, or such like, the peaceable course of justice is disturbed and stopped, so as the courts of justice be, as it were, shut up, *et silent leges inter. arma*, then it is said to be time of war ;" and such, also, is the opinion of the Supreme Court of the United States, and of this court. Co. Litt. 249*b*; 2 Wilson, 363; Pratt on Contraband, p. 75; *Prize Cases Sup. C. U. States*, 20 Legal Int. 84; 2 Black. 635; *Monongahela Ins. Co.* v. *Chester*, 10 Leg. Journal, 217.

The individuals making war against us are both traitors and enemies, and it is waged upon a scale of the greatest magnitude, calling into the service of the country an army of eight hundred thousand men. It is, therefore, the duty of the government to use every means within the scope of their authority to recruit the armies of the Union, and to sustain the gallant soldiers and generals who, by their glorious efforts and sacrifices, are gradually but certainly restoring the Union to the full extent of its ancient limits.

I am, therefore, of opinion that the act in question is constitutional, and that on this ground the motion for a special injunction should be refused. Here I might stop, but as I have grave reasons for believing that this court has no power in the premises, it is proper to state my views upon this point.

The proposition submitted to this court by the counsel of the plaintiffs is, that a State tribunal should prohibit an officer of the United States, acting in strict conformity to an act of Congress, from performing the duties imposed upon him by law. I cannot think we have any such power. If we have it, has not the governor or the legislature the same power? and if so, to what must it inevitably lead?—a collision between the National government and one or more of the branches of the State government, of which the judiciary is certainly the weakest. We have had serious lessons on this subject, which should teach us to be careful in asserting that the State authorities are to be the judges of the constitutional powers of the general government.

In 1812 the judges of the Supreme Court of Massachusetts, all of whom in turn were chief justices, gave their opinion that Governor Strong, and not the President, was the judge of the exigencies in which the militia could be called into the service of the United States. 8 Mass. 549. This opinion was solemnly overruled by the unanimous decision of the Supreme Court of the United States upon this same question. *Martin* v. *Mott*, 12 Wheat. 19; 5 Gray, 121.

A celebrated convention, in 1815, in relation to Mr. Monroe's

[Kneedler *v.* Lane et al.  Smith *v.* Lane et al.  Nichols *v.* Lehman et al.]

bill for a draft, used this language: "The power of compelling the militia and other citizens of the United States, by a forcible draft or conscription, to serve in the regular armies, as proposed in a late official letter of the Secretary of War, is not delegated to Congress by the Constitution, and the exercise of it would be not less dangerous to their liberties than hostile to the sovereignty of the States. The effort to deduce this power from the right of raising armies is a flagrant attempt to pervert the sense of the clause in the Constitution which confers that right, and is incompatible with other provisions in that instrument. The armies of the United States have always been raised by contract, never by conscription, and nothing more can be wanting to a government possessing the power thus claimed to enable it to usurp the entire control of the militia, in derogation of the authority of the State, and to convert it by impressment into a standing army." 7 Niles' Reg. 307. They also denounced as unconstitutional the law authorizing the enlistment of minors and apprentices without the consent of parents and guardians. The remedy proposed by the Convention was contained in its first resolution: "*Resolved*, That it be, and hereby is recommended to the legislatures of the several States represented in this Convention, to adopt all such measures as may be necessary to protect the citizens from the operation and effects of all acts which have been or may be passed by the Congress of the United States, which shall contain provisions subjecting the militia or other citizens to forcible drafts, conscriptions, or impressments, not authorized by the Constitution of the United States." Id. 312.

We may presume that neither the executive nor legislative branches of our State government would adopt so unpatriotic a course, originally marked out by a body of men who, however respectable in private life, were believed by the dominant party and the people of that day to entertain designs of a treasonable character. Their reward was a forced retirement from public life, and involuntary political oblivion.

But this appeal is made to the State judiciary, who clearly have no more right to interfere with an officer of the United States, holding a citizen under the authority of the United States, under a law of the United States, upon an allegation of unconstitutionality, than the State executive or the State legislature would have. This is clear. The Supreme Court of the United States have indeed decided this question in direct terms, intended to prevent all interferences of State authorities with the execution of the laws of the United States by their own officers. *Ableman* v. *Booth*, 21 Howard, 523. It will be recollected that the present application is a substitute for the writ of habeas corpus, which has been suspended; and that the

plaintiffs in the cases before us allege that they have been drafted, and have received notice of the draft, and are placed on the footing of enlisted soldiers, and liable to be punished as deserters should they fail to report for duty, which they have done.   All these facts appear on the face of the plaintiffs' bills of complaint, and the court is judicially apprised that they are in custody, under the authority of the United States. Chief Justice Taney says: " They then know that the prisoner is within the dominion and jurisdiction of another government, and that neither the writ of habeas corpus nor any other process issued under State authority, can pass over the line between the two sovereignties.   He is then within the dominion and jurisdiction of the United States."   " No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judges by whom it is issued, and an attempt to enforce it beyond these boundaries is nothing less than lawless violence," which would be resisted by force.   Id. 524.

The doctrine contended for by the plaintiff's counsel is simply the Calhoun heresy of nullification exploded by General Jackson, applied, not by a convention or a State legislature, but by a State judiciary, who may, by preliminary injunctions, stop the raising of armies and the collection of taxes, duties, imposts, and excises, and thus paralyze the arm of government when stretched out to repel a foreign foe, or to suppress a rebellion backed by several hundred thousand men in the field. I cannot agree that this court can nullify an act of Congress by any prohibitory writ.

I therefore think this court has no power to entertain these bills, and, of course, no authority to grant the injunctions prayed for, in which I find I am supported by the Supreme Court of Michigan.   Am. Law Reg. vol. 2, N. S. 598.

But I am also of opinion that we have no power, sitting as a court of equity, to grant the relief prayed for.   Our authority is alleged to proceed from the fifth clause of the thirteenth section of the act of 16th June, 1836, which is in these words : The Supreme Court (and now all the courts of common pleas and district courts) shall have the power and jurisdiction of courts of chancery, so far as relates to " V. The prevention or restraint of the commission or continuance of acts contrary to law and prejudicial to the interests of the community, or the rights of individuals."   Brightly's Purdon, p. 401.

Now neither in this provision, nor in the report of the revisers, nor in any of the decisions of the court, do I find any warrant to grant injunctions to stop the proceedings of officers of the United States under acts of Congress regularly enacted.   If such be our power, then the sooner the legislature interposes

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

its legitimate power to alter the law, and to prevent the various courts of the State from exercising a jurisdiction with which they never intended to invest them, the better.

I am, therefore, of opinion that under the act of assembly we have no such jurisdiction as is here claimed.

### *Appendix to Judge Read's Opinion.*

#### B.

Mr. Biddle was in France, with General Armstrong, and the following is an extract from his speech in the Senate of Pennsylvania, on 10th January, 1815.   Mr. Biddle said: "I well know, sir, that a project of this kind has been assailed in Congress, where it has been branded as a French conscription, the very name of which was fatal to it.   One word, sir, about conscription.   It is thought because Bonaparte made use of it, it is improper for any country to resort to anything like it.   But take it in its most odious form, it is not the project of Bonaparte.   It was resorted to by the French Convention, in their contest for liberty, when all the nations of Europe were arrayed against them, and when they had alone the hearts of the people of this country in their favor.   It was resorted to and found successful in repelling the foes of that republic.   The Emperor afterwards employed the same method of raising troops, and he abused it.   In its original form it was efficient without being tyrannical."   "Yet with all its faults the French conscription is the most equal mode of military levy on the continent of Europe."   "I say it, because I have seen its operations."   "This mode, however, is not peculiar to France; it was resorted to in our revolutionary war, long before it was used in France. It was made use of by every State in that war."

#### C.

It is obvious that a State court, without declaring an act of Congress unconstitutional, might by their decisions upon its construction, practically nullify it, if they can use the writ of injunction to enforce their decrees against the officers of the United States intrusted with the execution of its provisions.

#### D.

The intention of the legislature in giving the writ of injunction was to enable the court to restrain nuisance, trespass, waste, and proceedings at law, but never to substitute it for the writ of habeas corpus in favor of a person in custody.   It is clear that the State writ could not be used to restrain proceed-

[Kneedler *v.* Lane et al.　Smith *v.* Lane et al.　Nichols *v.* Lehman et al.]

ings at law in a court of the United States. Before the act of June 16, 1836, the Supreme Court possessed no general equity powers, and could not issue writs of injunction, and the legislature never dreamed that by these words that court would claim under them, to stop the execution of the laws of the United States, by officers appointed by the general government in the regular performance of their official duties.